**Gordon ANDERSON et al., Plaintiffs-Appellees,**

v.

**ICELAND STEAMSHIP COMPANY, Defendant-Appellant.**

**No. 77–1266.**

United States Court of Appeals, First Circuit.

Argued April 5, 1978.

Decided Sept. 29, 1978.

---

Richard A. Dempsey, Boston, Mass., with whom Leo F. Glynn and Glynn & Dempsey, Boston, Mass., were on brief, for defendant-appellant.

David B. Kaplan and Michael B. Latti, with whom Edward J. White and Latti & Flannery, Boston, Mass., were on brief, for plaintiffs-appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Iceland Steamship Company ("Iceland") appeals from a verdict of $65,000 plus interest in favor of longshoreman Gordon Anderson. Following a five day trial, the jury returned a verdict finding that shipowner Iceland's negligence was partially responsible for Anderson's injury. The jury found both the shipowner and Anderson equally negligent and apportioned liability equally between them. Iceland timely moved for a directed verdict at the close of all the evidence, Fed.R.Civ.P. 50(a), and both for a new trial, Fed.R.Civ.P. 58, and for a judgment n. o. v., Fed.R.Civ.P. 50(b), within ten days after entry of judgment. All were denied.

*Factual Background*

Iceland's vessel, GODAFOSS, entered the port of Gloucester, Massachusetts, on November 5, 1974 carrying a cargo of frozen fish. Unloading was handled by the Elliott Stevedoring Company and took place at a pier owned by Quincy Market Cold Storage and Warehouse Company. Longshoreman Gordon Anderson worked as a checker on the pier, checking markings on the cargo after it had been removed from the ship's hold and had been placed on a forklift for transfer to Quincy Market Cold Storage's freezers. Anderson's checking station was a desk inside a shed on the pier. Simultaneously checking the cargo was an employee of Quincy, ascertaining the condition of

the cargo prior to storage in Quincy's freezers.

Both Anderson and Quincy's checker were responsible for noting "exceptions" to the condition of the cargo. An exception is noted when the cargo is received in an unacceptable condition, such that Quincy assumes no responsibility for it. Exceptions are noted to wet, leaking and soft cargo. None was noted on either November 6 or November 7, during the unloading of the GODAFOSS. Cargo that is received in a wet, soft, leaking condition is considered distressed and is not sold for human consumption. State and federal agents are called in to determine the disposition of the cargo. None was called for the GODA-FOSS cargo. When cargo is received in a wet, soft, leaking condition, the longshoremen's contract with the Elliott Stevedoring Company calls for extra pay for the special handling such cargo requires. No extra pay was requested or paid for the GODAFOSS cargo. The longshoremen and the stevedore supervisor testified that when cargo is received in a wet, soft, and leaking condition, a special procedure is employed to unload it. Shovels are used to deposit the cargo in barrels which the bridle lifts from the hold. This procedure was not employed for the GODAFOSS cargo.

Cargo that is received with open flaps, torn cartons, and fish exposed is considered normal. Testimony indicated that fish arrives in this condition from practically every ship entering Gloucester and that it requires no special handling. If "remastering" is necessary, the Elliott supervisor testified that it would be done by the stevedoring contractor, inside the warehouse building. Remastering involves placing smaller cartons of fish into larger "master" containers and is done when the original containers have torn or when otherwise needed to make handling easier. Elliott assigned one man for two hours to perform remastering duties on the GODAFOSS cargo and billed Iceland Steamship Company for the costs, as is customary.

The GODAFOSS had encountered stormy seas en route, which caused the cargo to shift. When the ship next put into port, still in Iceland, new masters were obtained and the cargo partially remastered by the ship crew. There were insufficient masters available at the small port in Iceland so part of the cargo remained unmastered. To prevent further slippage, cargo was stowed over the unmastered cargo. The unmastered cargo was sitting beneath other stowage so no attempt was made to remaster at Reykjavik, the next port of call. There was trial testimony that it is not uncommon for ships to be unloaded in Gloucester with no master cartons whatsoever. There was further testimony that, due to the rigors of ocean sailing, it was rare to encounter cargo that was totally intact without evidencing some effects of the travails of sea travel.

The GODAFOSS was unloaded during November 6 and 7. Stevedoring operations were under the control of Elliott Stevedoring Company. There was no evidence that the ship's crew or officers played any role in unloading the cargo. According to the testimony, the cargo was raised from the hold with a bridle and pallet. Anderson testified, both in his pretrial deposition and at trial, that he had complained to the longshoreman working the hold that the racks which were being sent up from the hold were unsteady, causing cartons to fall from the forklift once aboard the dock. He testified that he repeated his complaint to the longshoremen seven or eight times on November 7, the day he was injured. In his pretrial deposition, Anderson attributed the unsteady racks to the fact that the longshoremen were throwing the cargo onto the pallets.[1] At trial, he attributed the unsteady pallets to the fact that the cartons were wet, soft and leaking, and he testified that the messy conditions inside the hold, due to the unmastered cartons, made it difficult for the longshoremen to properly stack the racks. Anderson stated at trial

1. Gloucester longshoremen are paid by the piece rather than by the hour, thereby placing a premium on working rapidly.

that he requested a mate from the GODA-FOSS to send someone down to remaster the cartons in the hold and, according to Anderson's trial testimony, was told that crew members would do so.

Two fellow longshoremen testified that they recalled that the cargo that day was wet, soft and leaking. Neither longshoremen kept records and both conceded that they had unloaded approximately three hundred ships during the intervening nearly two and one-half years. The GODAFOSS recorded temperatures inside the hatch every four hours on November 6, after the longshoremen had completed discharging for that day. The warmest temperature recorded was 20.2 below zero on the Centigrade scale.[2] At 8:00 P.M. on November 7, after closing the hatch following discharge of the cargo, the recorded temperature was minus 21 on the Centigrade scale.

Anderson testified that the dock area had become covered with gurry[3] and slime. He attributed this to the fish cartons which continued to fall from the pallets and spill their contents over the dock. Although attempts were made, by Anderson and the forklift operator, to pick up the spilled cartons, Anderson claimed that some of the fish remained on the floor and was subsequently run over by the forklift, causing additional juices and slippery substances to coat the area. He testified that the vicinity where he was working was "slippery and gooey[.]" This characterization was implicitly challenged by the Quincy checker, working adjacent to Anderson, who stated that the floor where he worked was not slippery.

The Elliott supervisor testified that it is the responsibility of the stevedoring contractor to maintain the dock in safe working condition. He stated that brooms were available to sweep up debris and a drying agent akin to sawdust, called "Speedy-Dry," was available to dry the floor should it become wet. Pursuant to OSHA regulations, the stevedore has responsibility for the working area and specifically for re-

moving unsafe conditions as they appear. The regulation in point here reads: "Slippery conditions shall be eliminated as they occur." 29 C.F.R. § 1918.91(c). There was no testimony that any crew member or officer of the GODAFOSS was in the shed area where Anderson sustained his injury, nor any evidence that they knew or had been informed of the hazardous conditions on the dock. According to Anderson's testimony, the slippery conditions on the dock existed throughout November 6 and November 7. He did not request that the dock be cleaned nor did he attempt to use Speedy-Dry to absorb the liquid on the floor where he was working. There was testimony that the efficacy of Speedy-Dry would have been limited had bundles continued to fall, fish to spill, and the forklift continue to be driven over the area.

Anderson testified that he had suffered two injuries previously, both to his back. He stated that he had no lingering effects from the prior injuries. The Elliott Stevedoring Company foreman testified that in July, 1974, following one of the injuries, he had instructed Anderson that, under no circumstances, was he to pick up any cartons of fish.

Anderson received the injury for which he sued Iceland at approximately 2:00 P.M. on November 7, 1974. He stated that the forklift operator had spilled several boxes of cargo and had called Anderson to help pick them up. Anderson testified that, while lifting a box weighing about fifty pounds, his foot skidded on the slippery floor and he twisted his back. He dropped the bundle he was holding, but finished out the day.

*The 1972 Amendments to the LHWCA*

The 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.*, were intended to abolish the *Sieracki* and *Ryan* doctrines of liability. In *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099

---

2. 0° Centigrade = 32° Fahrenheit (freezing).

3. "Gurry" is fishing offal or waste; it is gummy and slimy.

(1946), the Supreme Court extended admiralty's no fault liability, expounded in a long line of cases, starting with *The Osceola*, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), through *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), to longshoremen as well as seamen. Shipowners were rendered liable to longshoremen for unseaworthy conditions, irrespective of fault. In *Alaska Steamship Co. v. Petterson*, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), the doctrine of absolute liability by the shipowner to the longshoremen was extended to embrace accidents involving equipment brought aboard ship, owned, and operated by the stevedoring company.[3a] Two years later, in *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court gave judicial redress to the beleaguered shipowner by articulating a right-over of the shipowner for indemnification from the stevedore for breach of the contractor's "warranty of workmanlike performance."

This anomalous situation, whereby the statutory immunity of the employer-stevedore was end-run and the costs attending third party litigation mounted drastically, was exacerbated by the meager benefits provided to injured workers under the previous Act. The maximum statutory benefits available to a longshoreman who was injured were $70 per week. There were instances where the injured worker received as paltry a sum as $18 per week. Congress addressed this situation by adding the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act. *See* H.R.Rep.No.1441, 92d Cong., 2d Sess. 1 (1972), reprinted in [1972] U.S.Code Cong. & Admin.News, pp. 4698, 4700–4703.[4]

In hammering out the final version of the bill, a compromise was reached. Congress eliminated any claim of indemnity against the stevedore in exchange for limiting the shipowner's liability to negligence and for dramatically increasing workmen's benefits. *Id.*; 33 U.S.C. § 905. The Congressional history evinces a specific intent to eradicate recovery based on a theory of unseaworthiness:

> The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as "unseaworthiness", "nondelegable duty", or the like.

U.S.Code Cong. & Admin.News, *supra*, at 4703. Courts, when confronting a claim by a longshoreman against a vessel, are to fashion a nationally uniform negligence law, derived from analogies to land-based tort concepts. *Id.* at 4703–4705. *See generally Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233 (5th Cir. 1977); *Munoz v. Flota Merchante Grancolombiana, S.A.*, 553 F.2d 837 (2d Cir. 1977); *Hurst v. Triad Shipping Co.*, 554 F.2d 1237 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Edmonds v. Compagnie Generale Transatlantique*, 558 F.2d 186 (4th Cir. 1977). *Cf., Wescott v. Impresas Armadoras, S.A. Panama*, 564 F.2d 875 (9th Cir. 1977).

Many courts, in applying the 1972 amendments, have adverted to the standards of care owed by possessors of land to invitees,[5] as articulated in the Restatement (Second)

---

**3a.** *See* dissenting opinion of Mr. Justice Burton for a critical exposition of the expanding doctrine of unseaworthiness, 347 U.S. at 396–402, 74 S.Ct. 601.

**4.** For a detailed historical discussion, *see Lucas v. "Brinknes" Schiffahrts Ges.*, 379 F.Supp. 759 (E.D.Pa.1974), *appeal dismissed*, No. 75–1223 (3d Cir., Apr. 30, 1975), *cert. denied*, 423 U.S. 866, 96 S.Ct. 127, 46 L.Ed.2d 95 (1975). *See also Edmonds v. Compagnie Generale Transatlantique*, 558 F.2d 186 (4th Cir. 1977); *Hurst v.*

*Triad Shipping Co.*, 554 F.2d 1237 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Gay v. Ocean Transport & Trading Co.*, 546 F.2d 1233 (5th Cir. 1977); *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31 (3d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).

**5.** Concern has been expressed with the possibility that the classifications of licensee or invitee might be engrafted onto the law of negligence to be developed under the 1972 amend-

of Torts, §§ 343, 343A ("Restatement"). *See e. g., Gay, supra,* 546 F.2d at 1241–1242; *Napoli v. [Transpacific Carriers, Etc.] Hellenic Lines,* 536 F.2d 505, 509 (2d Cir. 1976). Other courts have suggested that the duties owed by an employer with respect to actions of an independent contractor, as expressed in sections 409–429 of the Restatement, are more analogous to those owed by a shipowner to longshoremen who are employees of a stevedoring contractor. *See e. g., Munoz, supra,* 553 F.2d at 841; *Hurst, supra,* 554 F.2d at 1249–1253; *Shepler v. Weyerhaeuser Co.,* 279 Or. 477, 569 P.2d 1040 (1977).

The legislative history of the 1972 amendments indicates that the defenses of con-

tributory negligence and assumption of risk are to be precluded in actions by injured longshoremen. U.S.Code Cong. & Admin. News, *supra,* at 4705. The admiralty concept of comparative negligence[6] is intended to apply. *Id.* A problem, noted by other courts, *see, e. g., Hurst, supra,* 554 F.2d at 1250 n.35; *Brown v. Ivarans Rederi A/S,* 545 F.2d 854, 863–864 n.10 (3d Cir. 1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Shepler, supra,* 569 P.2d at 1050, in applying either section 343 or 343A of the Restatement to a longshoreman's action against a vessel is the incorporation of the defenses of contributory negligence and assumption of risks which both those sections contain.[7] *See* Restatement

ments. *See e. g., Brown v. Ivarans Rederi A/S,* 545 F.2d 854, 863 (3d Cir. 1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Shepler v. Weyerhaeuser Co.,* 279 Or. 477, 569 P.2d 1040, 1050–1052 (1977). This is most unlikely. In *Kermarec v. Compagnie Generale,* 358 U.S. 625, 629–632, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959), the Court held that the standard of care owed by a vessel to persons on board for legitimate purposes was one of reasonable care under the circumstances, freed from arbitrary common law classifications.

**6.** The record does not require us to address the question of comparative negligence and the proper method for apportioning liability as between a negligent shipowner and a negligent stevedoring contractor. We specifically reserve opinion on that question, while noting the differing treatment the issue has received in other circuits. There are three approaches, which we below summarize.

The first is the so-called "Murray credit." *Murray v. United States,* 132 U.S.App.D.C. 91, 405 F.2d 1361 (1968). The Murray credit is invoked where the concurring negligence of a statutorily immune tort-feasor (e. g., the stevedore) reduces by one-half the damages a plaintiff may recover from the other tortfeasor (e. g., the shipowner).

The second is the approach adopted by the Ninth Circuit. *Dodge v. Mitsui Shintaku Ginko K.K. Tokyo,* 528 F.2d 669 (9th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *Shellman v. United States Lines, Inc.,* 528 F.2d 675 (9th Cir. 1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1668, 48 L.Ed.2d 177 (1976). In *Shellman,* there was no negligence found on the part of the longshoreman. Concurring negligence by the shipowner (30%) and the stevedore (70%) was found. The plaintiff was allowed to recover full damages against the shipowner on the theory that to reduce the

longshoreman's recovery by the amount of the stevedore's negligence would be to permit indirectly contribution from the stevedore-employer, a result the court construed as incompatible with the 1972 amendments.

The third approach is the "equitable credit" doctrine adopted by the Fourth Circuit in *Edmonds, supra,* 558 F.2d 186. The longshoreman there was found 10% negligent, the shipowner 20% negligent, and the stevedore 70% negligent. In refusing to follow the Ninth Circuit, the *Edmonds* court allowed the plaintiff to recover 20% of the total damages from the shipowner, on the rationale that the 1972 amendments rendered the vessel liable solely for its *own* negligence and that the longshoreman, who recovers statutory benefits without proof of fault on anyone's part, has no "inherent right to recover from a vessel [for] damages caused by the negligence of a stevedore." *Id.* at 192.

**7.** Those sections read as follows:

§ 343. *Dangerous Conditions Known to or Discoverable by Possessor*

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

§ 343A. *Known or Obvious Dangers*

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(Second) of Torts § 343, Comment d; § 343A, Comments b, d, e (1965). Because we do not view those sections as controlling the type of accident which occurred here, we specifically leave open the possibility of harmonizing those sections with the defense of comparative negligence. *Cf. Gay, supra,* 546 F.2d at 1240–1242; *Napoli, supra,* 536 F.2d at 508–509.

██ The legislative history also discloses an intent on the part of Congress to abolish the theory of strict liability, whether called a "non-delegable duty" or "unseaworthiness," U.S.Code Cong. & Admin.News, *supra,* at 4703, and to make the shipowner responsible solely for negligence by the vessel itself. Specifically, the House Report comments, "[t]he vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore." *Id.* at 4704. It, therefore, follows that certain of the duties owed by the employer of an independent contractor, found in sections 416–429 of the Restatement, are not applicable to suits such as the one at bar. Those sections involve situations where the employer (the shipowner here) is held liable irrespective of any fault of the employer himself, on principles of vicarious liability. Sections 416–429 of the Restatement premise liability on the existence of a non-delegable duty owed by the employer which he is not free to delegate to the independent contractor.[8] Since vicarious liability for injuries caused by the stevedore or its employees is now precluded as a basis of recovery against the shipowner, we find that reliance on those sections of the Restatement (sections 416–429) is inappropriate.

> (2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

8. The Introductory Note to the Restatement of Torts dealing with sections 416–429 highlights the distinction between the preceding sections, sections 410–415, dealing with the employer's own negligence, and those contained in sections 416–429, dealing with vicarious liability:

> *Introductory Note:* The rules stated in the following §§ 416–429, unlike those stated in the preceding §§ 410–415, do not rest upon

██ Sections 409 through 415 of the Restatement, on the contrary, relate to the liability of an employer of an independent contractor for harm caused by his own fault. The 1972 amendments permit such liability to be imposed on a vessel in an action such as the one before us. Further, in this case the harm to plaintiff occurred during the course of stevedoring operations pursuant to an independent contract arrangement. Therefore, sections 409 through 415 provide appropriate guidance for the resolution of the negligence issue presented in this case. *See Hurst, supra,* 554 F.2d at 1249–1253.

### Duty of the Shipowner to the Longshoreman

The accident involving Anderson took place on the pier, which was owned by Quincy and under the operative control of Quincy and Elliott Stevedoring Company. There was no allegation that the ship's crew exercised control over the stevedoring operations or over the dock area where Anderson was injured. Anderson brought suit pursuant to 33 U.S.C. § 905(b), which reads, in pertinent part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . may bring an action against such vessel as a third party . . . . The liability of the vessel . . . shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this

> any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault. . . .
>
> The statement commonly made in such cases is that the employer is under a duty which he is not free to delegate to the contractor. Such a "non-delegable duty" requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be an independent contractor, to whom the performance of the duty is entrusted.

subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

 Because the injury did not occur on premises owned or possessed by the ship, we need not and do not resolve the problems posed by the implicit incorporation of contributory negligence and assumption of risk embodied in sections 343 and 343A (duties owed by possessors of land), *see* discussion, *supra*, at 10. We find those sections inapplicable in a case such as this where the injury occurs elsewhere than the vessel. The liability, if any, of the shipowner to the longshoreman is to be adjudged by the standards articulated with respect to duties owed by the employer of an independent contractor.[9] To posit liability on the ship's part, we must find that the ship owed a duty to Anderson, which it breached, and that said breach was a legal cause of Anderson's injury.

In assessing liability under the Restatement sections relevant to independent contractors, sections 409–415, we do not find that any one section parallels precisely the factual situation presented in this case. However, it seems clear that the most fa-

vorable section to the plaintiff's cause would be section 414A.[10] That section reads:

§ 414A. *Duty of Possessor of Land to Prevent Activities and Conditions Dangerous to Those Outside of Land*

A possessor of land who has employed or permitted an independent contractor to do work on the land, and knows or has reason to know that the activities of the contractor or conditions created by him involve an unreasonable risk of physical harm to those outside of the land, is subject to liability to them for such harm if he fails to exercise reasonable care to protect them against it.

Without committing ourselves to adopting this section as the general rule to be applied to longshoreman accidents occurring off the vessel, we have no hesitancy in concluding that if the evidence presented by plaintiff cannot withstand analysis under this standard, it cannot support a cause of action consistent with the requirement of the 1972 amendments. Since there was no suggestion here that the work was abnormally dangerous,[11] as that term is used in

9. In this instance, we find that the duties owed by the shipowner to the longshoremen are those owed by one hiring an independent contractor. The Restatement of Tort articulates the duty as follows:

As the common law developed, the defendant who hired the contractor was under no obligation to the servants of the contractor, and it was the contractor who was responsible for their safety. The one exception which developed was that the servants of the contractor doing work upon the defendant's land were treated as invitees of the defendant, to whom he owed a duty of reasonable care to see that the premises were safe. This is still true. *See* § 343. In other respects, however, it is still largely true that the defendant has no responsibility to the contractor's servants. Restatement (Second) of Torts, "Special Note" to Chapter 15 at 17, Tentative Draft No. 7 (1962).

10. There was no evidence that the shipowner had retained control over any aspect of unloading operations, *see Hurst v. Triad Shipping Co., supra,* 554 F.2d at 1251–1252, and we, therefore, find § 414 of the Restatement inapposite. (Ultimate control retained by employer.) As aptly noted in *Hurst,* the fact that the shipowner had the ultimate power to order that work

be discontinued at any juncture is not the type of control envisioned by the Restatement rule. Comment c to § 414 of the Restatement is apposite:

§ 414 Comment c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

11. § 520. *Abnormally Dangerous Activities*

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

the Restatement, we need not consider whether the shipowner might, at times, be held to a stricter duty of care, appropriate to such circumstances. *See e. g.*, § 427A of the Restatement. In terms of the facts of this case, section 414A provides for the heaviest duty of care to which the vessel may reasonably be bound. To succeed, plaintiff must at least meet the burden of satisfying that standard.[12]

We must also determine to what extent the shadow of *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), beclouds our analysis. *Gutierrez* involved a situation where coffee beans had been loaded into the ship's hold in defective bagging. As a result, the bags split and beans spilled out, creating a dangerous condition for the working longshoremen. The bags had been leaking beans prior to discharge and the district court found that the ship knew or should have known of the inadequate bagging. A longshoreman on the pier slipped on a coffee bean and injured his back. The Supreme Court, in reversing our decision, 301 F.2d 415, affirmed the trial court's finding of negligence and unseaworthiness. In assessing the impact of *Gutierrez* on our decision today, we note the following.

*Gutierrez* antedated the 1972 amendments and is framed throughout in terms of the prior law, *i. e.*, the absolute duty of the shipowner toward longshoremen. Therefore, even though the Court states that it rests its finding of liability on both unseaworthiness and negligence, the two concepts are continuously intertwined, such that it becomes difficult, if not impossible, to extricate one from the other. In the

section of the opinion where the Court upholds the district court's finding of negligence, *id.* at 210–212, 83 S.Ct. 1185, the Court makes this final observation: "Respondent allowed the cargo to be discharged in dangerous and defective bagging, from which beans were leaking before discharge of the cargo began. It had an *absolute and nondelegable* duty of care toward petitioner not to create this risk to him, which it failed to meet." (emphasis added). *Id.* at 211–212, 83 S.Ct. at 1189. The negligence therein was couched in terms of breach of a non-delegable duty, which is the catchword for unseaworthiness. We, therefore, do not view *Gutierrez* as controlling this case, where liability must rest *solely* on negligence.

We now review the most pertinent evidence and all reasonable inferences from that evidence in the light most favorable to plaintiff Anderson. On November 5, 1974, the GODAFOSS arrived at Gloucester for unloading of frozen fish, which took place November 6 and 7. Some of the fish was mastered, some was not. Some of the boxes arrived with torn cartons and flaps, with some fish exposed. Some of the boxes may have been wet, soft, and leaking.[13] There was no testimony that an unsafe condition had developed aboard ship, either on deck or within the hatch, as a result of gurry and fish juices. Nor was there evidence that any difficulty was encountered in raising the pallets by bridle from the hold and lowering them to the dock. The pallets were then taken by forklift to the checking desk where Anderson and a checker for Quincy Market Cold Storage and Warehouse Company examined the cargo prior to placement in Quincy's cold storage. During

---

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

*See also* Comment f to § 520.

**12.** We note in passing that the drafters of the Restatement would not apply § 414A to ser-

vants of an independent contractor. *See* note 9 *supra.* At best, § 414A provides an argument by analogy. Nor are we convinced that § 414A, which lacks the requirement of supervisory control by the employer (*see* note 10 *supra* ), should apply when the dangerous condition created off the employer's premises is not integrally related with conduct on the employer's premises. *Cf.* Restatement (Second) of Torts § 414A, Comment c. & Illustration 3.

**13.** We naturally do not intend to attempt to resolve conflicts in the testimony.

November 6 gurry and fish juices spread over the dock area, a result of the boxes' falling off the forklift and being subsequently run over by the tractor and/or by spillage of juices from the cartons. The gurry and fish juices remained on the dock throughout November 6 and November 7, with no attempt to sweep it clean or apply a drying agent to it. Longshoreman Anderson may have requested a crew member of the vessel to supply remastering cartons during the unloading. Elliott Supervisor, Francis Joseph Elliott, Jr., testified that remastering was the duty of the stevedore and that, in fact, some remastering had been done by the stevedoring contractor. There was no evidence that any member of the ship's crew had been advised or knew of the dangerous condition on the dock.

From this set of facts, we can state as a matter of law that no negligence could have been found on the part of the vessel. *Cf. Munoz, supra,* 553 F.2d at 841. The intent of the 1972 amendments was to abrogate the absolute liability of the vessel. To find liability on the part of the ship, there must be evidence that the ship breached a duty it owed to the plaintiff. In this case, we cannot say, based on the facts, that there was any such breach.

Francis Joseph Elliott, Jr., supervisor for the stevedoring contractor, testified that a standardized procedure existed to handle wet, soft and leaking cargo. That procedure was not utilized. He further testified that cargo frequently arrived totally unmastered and that such cargo presented no peculiar difficulties for the longshoremen and required no special handling. The supervisor went on to acknowledge that remastering, when necessary during unloading, was performed by the stevedore. The stevedore was under a statutory duty to keep the dock area safe and dry. 29 C.F.R. § 1918.91(c). The stevedore had materials available to accomplish this task. They were not used.

It was not negligent for the shipowner to have put into port with part of the cargo unmastered. It was conceded by all the testifying longshoremen that it was not at all unusual for entire cargoes to arrive unmastered. Nor would it have been negligence, as to the longshoremen,[14] for the GODAFOSS to arrive with cargo in a wet, soft, and leaking condition, since there was testimony that a safe and adequate procedure for unloading such a cargo was known and available to the longshoremen. *Cf. Hurst, supra,* 554 F.2d at 1249 n.35. The dangers posed by such cargo were open, obvious, and capable of being protected against by relatively simple measures known, available, and practiced in the stevedoring trade. A seagoing ship runs the constant risk of encountering severe weather. As a result, it is unlikely that cargo, no matter how carefully stowed, will emerge unscathed and unblemished from the journey. These conditions are known to exist and inhere in the very nature of seaborne commerce. The stevedore is hired for its expertise in handling cargo, including cargo which arrives from its journey in less than optimal condition.[15] If stowage or the cargo itself represents a risk to the longshoremen, the stevedore normally has the right to remedy the defect, at the expense of the ship (as was done here with the partial remastering performed by the stevedore) or to discontinue unloading operations. *Hamburg-Amerika Linie v. Gulf Puerto Rico Lines, Inc.,* 579 F.2d 115 (1st Cir. 1978).

---

14. We cannot say whether or not a ship which arrives with cargo which is wet, soft, and leaking may be liable for negligence to the ultimate consignee.

15. As was colorfully painted by the court in *Hugev v. Dampskisaktieselskabet International,* 170 F.Supp. 601, 609 (S.D.Cal.1959), *aff'd,* 274 F.2d 875 (9th Cir. 1960):

In almost every instance, when a stevedoring contractor commences the work of loading or unloading a seagoing vessel, the ship has arrived in port only a few hours before. She may have been at sea for weeks or months. Almost always, she has ridden some heavy seas. Often she may have rolled and pitched through mountainous seas for days, taken thousands of tons of water over her decks, sailed through freezing and tropical weather, and been beaten by 100 mile an hour gales. Almost surely she will have been serviced by stevedores of varying degrees of competency in other parts throughout the world.

There was no allegation that the vessel had been informed or knew of the slippery conditions on the pier. *Compare Lopez v. A/S D/S Svendborg and D/S of 1912 A/S*, 581 F.2d 319 (2d Cir. 1978). There was no evidence produced which showed that the shipowner was under an affirmative duty to discover and correct the dangerous condition existing on the pier. *See Wescott, supra*, 564 F.2d at 882–883. We do not intend to suggest that the shipowner is absolved of all duty to discover and correct dangerous conditions under all circumstances, but, merely, that on the facts as presented here, there was no showing of any duty on the vessel to be aware of and correct dangerous conditions existing, for approximately two days, on the dock. To find negligence on the part of the shipowner under this set of facts would catapult us back to the *Sieracki*, pre-*Ryan* days, where the shipowner was held to an absolute, nondelegable duty to the longshoremen and was unable to recover against the stevedore for its fault or negligence. The 1972 amendments preclude this. U.S.Code Cong. & Admin.News, *supra*, at 4701–4705.

The motion for directed verdict should have been granted and the judgment is accordingly *reversed*. No costs to either party.