Roger JOHNSON, Plaintiff-Appellee,

v.

A/S IVARANS REDERI,
Defendant-Appellant.

No. 79–1118.

United States Court of Appeals,
First Circuit.

Argued Sept. 7, 1979.

Decided Jan. 11, 1980.

---

Richard A. Dempsey, Boston, Mass., with whom Glynn & Dempsey, Boston, Mass., was on brief, for appellant.

Hiller B. Zobel, Boston, Mass., with whom Nathan Greenberg, and Brown, Rudnick, Freed & Gesmer, Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, KUNZIG, Judge, U.S. Court of Claims * and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

Plaintiff-appellee, Roger Johnson, a longshoreman employed by the New Bedford Stevedoring Company, was severely injured when he stepped into the open No. 3 tween deck hatch of the general cargo ship M/V SALVADOR and fell thirty feet into the hold of the vessel. Following a three day trial, the jury found that Johnson's injuries were caused by the sole negligence of the defendant-appellant shipowner, A/S Ivarans Rederi. Final judgment was entered for Johnson in the amount of $488,333.35, including interest. On appeal, defendant alleges the commission of three errors by the district court: failure to properly charge the jury; denial of its motion for judgment n. o. v.; and denial of its motion for a new trial.

The chief issue is the standard of care applicable in an action by a longshoreman against a vessel for injuries received while on the ship under section 905(b) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b).

## THE FACTS

The M/V SALVADOR carries general cargo between ports in North and South America. New Bedford, the site of this accident, is the ship's northernmost port of call. The ship has five cargo hatches, numbered sequentially from fore to aft, and three working levels: the "weather" or top deck; the "hold" or bottom of the vessel; and an interior deck, known as the "tween" deck, which runs through the three middle hatches at a level approximately one-third of the distance between the weather deck and the hold. The five cargo hatches are loaded through opened hatch covers in the weather and tween decks. The cargo hatches are separated by vertical partitions

known as bulkheads. Wide openings in the port and starboard sides of the bulkheads separating the No. 2, No. 3 and No. 4 hatches allow horizontal movement on the tween deck between those hatches. Vertical movement between the three working levels of the ship is accomplished by the use of ladders in the hatches.

On the day of Johnson's fall, a crew from New Bedford Stevedoring Company (the stevedore) boarded the ship at 8:00 a. m. to load cargo into the deep tanks of No. 2 hatch, the lower hold of No. 4 hatch and the lower tween deck of No. 5 hatch. No cargo was to be loaded into No. 3 hatch. Johnson was assigned to work with a five person crew unloading bags of fertilizer from pallets lowered by power winch into No. 2 deep tanks. When Johnson's crew descended into No. 2 deep tanks, the two seventeen foot wide openings in the bulkhead separating No. 2 and No. 3 hatch on the tween deck were not blocked off. The weather deck hatch covers of No. 3 hatch were closed, but the tween deck hatch covers of No. 3 hatch had been left open by a ship's crew that had been removing debris from the hold. The No. 3 tween deck was dark, due to the absence of artificial lighting and the fact that the weather deck hatch covers were closed. The open tween deck hatch covers in No. 3 left a square opening in the tween deck measuring approximately twenty feet by twenty feet. The opening had not been roped off and no hatch coaming or safety net had been used to protect a person from falling into the hold.

Prior to the commencement of work in No. 2 hatch, the open tween deck hatch covers in No. 3 hatch and the openings in the bulkhead leading to No. 3 hatch were noticed by Robert Duarte, the signalman for No. 2 hatch. It is the signalman's responsibility to warn the crew in the hatch of the approach of loads from above and to coordinate the work of the winch operator and the crew. Duarte informed the ship's mate of his observations and asked him to either rope off the bulkhead openings or close the hatch covers. The mate said he would take care of it right away.

At approximately 8:30 a. m., Johnson obtained permission to go ashore to replace his defective safety helmet. Johnson climbed the ladder to the No. 2 tween deck, where Duarte told him to get out of the way of a pallet of fertilizer bags being lowered into No. 2 hatch. Johnson then walked through the offshore opening in the bulkhead towards No. 3 hatch. After taking from five to seven steps, he fell into the hold through the open hatch.

## THE APPLICABLE STANDARD OF LIABILITY

The backbone of the charge given by the district court was derived from sections 343 and 343A of the Restatement (Second) of Torts (the Restatement).[1] Although this court has, on previous occasions, reached into the Restatement for principles to guide it in admiralty cases, see, e. g., Pino v. Protection Maritime Insurance Co., Ltd., 599 F.2d 10 (1st Cir. 1979) (Restatement of Torts § 766); Anderson v. Iceland S. S. Co., 585 F.2d 1142 (1st Cir. 1978) (Restatement (Second) of Torts § 414A), we have never

---

1. Those sections read as follows:

§ 343. *Dangerous Conditions Known to or Discoverable by Possessor*

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

§ 343A. *Known or Obvious Dangers*

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge of obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

utilized the provisions of the Restatement that describe the duties owed by landowners to invitees upon their land. We approached the question of the applicability of these sections in *Anderson*, noting the concern expressed by other courts about the incorporation of the prohibited defenses of assumption of the risk and contributory negligence, but concluded that the sections were not controlling under the facts of that case. *Anderson v. Iceland S. S. Co.*, 585 F.2d at 1146–48.[2]

Today, we face squarely the question of whether sections 343 and 343A of the Restatement should be the basis of the standard of care in a longshoreman's action against the vessel for personal injuries. This requires a review of the legislative history of the statute and an analysis of the pertinent case law and legal authority.

Section 905(b) of the Act[3] gives longshoremen a negligence action, exclusive of all other remedies, against the vessel for injuries received through the fault of the vessel. Since the term "negligence" is not defined in the statute, we look to the legislative history of the Act for assistance in determining how "negligence" is to be construed and applied.

The report of the House Committee provides the most assistance. *See* H.Rep. No. 92–1441, 92nd Cong., 1st Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, p. 4698 (House Report). After detailing the infirmities of the existing doctrines of unseaworthiness and indemnification and the

system of workmen's compensation, the House Report described the role the concept of negligence would play in the new law:

Accordingly, the Committee has concluded that, given the improvement in compensation benefits which this bill would provide, it would be fairer to all concerned and fully consistent with the objective of protecting the health and safety of employees who work on board vessels for the liability of vessels as third parties to be predicated on negligence, rather than the no-fault concept of seaworthiness. This would place vessels in the same position, insofar as third party liability is concerned, as land-based third parties in non-maritime pursuits.

The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as "unseaworthiness", "nondelegable duty", or the like.

*Id.* at 4703. We interpret this portion of the legislative history, particularly those phrases beginning with "insofar," as requiring the establishment of a doctrine of negligence liability *similar or analogous to* the terrene legal doctrine on which suits based on the negligence of the owner or occupier of land are based. *See Anderson v. Iceland S. S. Co., supra*, 585 F.2d at 1146.

**2.** As we noted in *Anderson*, there appears to be no place in the law of admiralty for distinctions between licensees and invitees. *Anderson v. Iceland S. S. Co.*, 585 F.2d 1142, 1146–47 n.5 (1st Cir. 1978).

**3.** Section 905(b) provides:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be [null and] void. If such person was

employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

The overriding purpose of the 1972 amendments was to create incentives for safety[4] in the nation's second most dangerous profession:[5]

> Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.
>
> So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances. The vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore.

*House Report, supra*, at 4704. This portion of the legislative history unequivocally asserts the intention of Congress that the vessel shall exercise a constant concern for the safety of longshoremen. In addition, it strongly implies that Congress believed the 1972 amendments continued, rather than created, a duty on the part of the vessel to maintain a safe place to work. Although the last sentence acknowledges the stevedore's primary responsibility for safety in the work area, it also indicates that the vessel and the stevedore can be concurrently negligent in regard to a particular work hazard.

Having placed upon the vessel the general duty to exercise reasonable care under the circumstances, Congress then addressed the standard of care to be utilized in implementing that duty:

> Under this standard, as adopted by the Committee, there will, of course, be disputes as to whether the vessel was negligent in a particular case. Such issues can only be resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties.

*House Report, supra*, at 4704.

While Congress delegated to the courts the responsibility for fashioning the standard of care to be used in section 905(b) cases this authority did not come without legislative constraints:

> The Committee intends that on the one hand an employee injured on board a vessel shall be in no less favorable position vis a vis his rights against the vessel as a third party than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances.
>
> . . .
>
> Finally, the Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law. In that connection, the Committee intends that the admiralty concept of comparative negligence, rather than the

---

4. *See* S. Rep. No. 92–1125, 82nd Cong., 2nd Sess. 2 (1972): "It is the Committee's view that every appropriate means be applied toward improving the tragic and intolerable conditions which take such a heavy toll upon worker's lives and bodies in this industry."

5. At the time of consideration of the 1972 amendments, only coal mining was a more dangerous vocation than longshoring.

common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of "assumption of risk" in an action by an injured employee shall also be applicable.

Finally, the Committee wishes to emphasize that nothing in this bill is intended to relieve any vessels or any other persons from their obligations and duties under the Occupational Safety and Health Act of 1970. The Committee recognizes that progress has been made in reducing injuries in the longshore industry, but longshoring remains one of the most hazardous types of occupations. The Committee expects to see further progress in reducing injuries and stands ready to immediately reexamine the whole third party suit question if it appears that the changes made in present law by this bill have affected progress in improving occupational health and safety.

*House Report, supra,* at 4704–05.

 Analyzing the House Report as a whole, we conclude that in enacting section 905(b), Congress intended that each of the parties in the stevedoring injury triangle— the vessel, the stevedore and the longshoreman—owe a duty to exercise reasonable care under the circumstances. Congress left to the courts the articulation and application of the standard of care in the particular circumstances of each case. The parameters of the standard of care the courts are to develop are clear: the vessel will continue to be liable for any negligent failure on its part to provide a safe place to work; OSHA regulations will continue to apply to all parties and may, in certain circumstances, define the appropriate standard of care; no standard of care may incorporate the doctrines of assumption of the risk, contributory negligence or liability without fault (unseaworthiness); the standard of care may be neither as unfavorable to the vessel as strict liability nor more

unfavorable to the longshoreman than land-based tort law; the standard of care must evolve as a uniform body of national law; and, the body of law must develop so as to have the maximum impact on safety.

We discern in the statute and its legislative history no requirement that, in fashioning this uniform body of national law, the courts must adopt writ large the tort concepts developed over the years as to possessors of land as the standard of care for an industry that has until this time been governed by the principles of maritime law. We believe that our responsibilities under section 905(b) are similar to those Congress placed upon the courts by the adoption of the Federal Employer's Liability Act [6] and the Jones Act,[7] at least in regard to the development of the standard of care:

> In the railroad and shipping industries, however, the FELA and Jones Act provided the framework for determining liability for industrial accidents. But instead of a detailed statute codifying common-law principles, Congress saw fit to enact a statute of the most general terms, thus leaving in large measure to the courts the duty of fashioning remedies for injured employees in a manner analogous to the development of tort remedies at common law. But it is clear that the general congressional intent was to provide liberal recovery for injured workers, *Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508–510, [77 S.Ct. 443, 449–450, 1 L.Ed.2d 493], and it is also clear that Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its workers.

*Kernan v. American Dredging Co.,* 355 U.S. 426, 432, 78 S.Ct. 394, 398, 2 L.Ed.2d 382 (1958). The Supreme Court has recently noted that, within legislative parameters, "[a]dmiralty law is judge-made law to a great extent." *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979).

---

**6.** 45 U.S.C. §§ 51 *et seq.* (1972).

**7.** 46 U.S.C. § 688 (1975).

In developing this uniform body of national law, we must discard any concept antithetical to the intent of Congress and may incorporate into it recognized legal concepts that will promote the primary congressional objective of longshoremen safety. A review of recent case law and an examination of scholarly inquiry [8] into the 1972 amendments, discloses three relevant strains of law from which we may synthesize a standard of care to implement section 905(b): the standards of negligence developed for seamen under the Jones Act; the body of negligence law developed in longshoremen's cases prior to the adoption of the exclusivity provisions of section 905(b) in 1972; and the principles of land-based tort law embodied in the Restatement.

The remedies now available to injured seamen and longshoremen are the products of a turbulent evolution. Although admiralty law has always provided longshoremen with the remedy of an action in negligence against third parties, including the vessel, that remedy appears to have been limited by the concurrent applicability of the doctrines of assumption of the risk and contributory negligence. *See, e. g., The Omsk*, 266 F. 200, 202 (4th Cir. 1920). Until the passage of the Jones Act in 1920,[9] injured seamen could sue the vessel for violation of the warranty of unseaworthiness, *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760 (1903), but they could not recover for the vessel's negligence unless the negligence coincidentally created the unseaworthy condition. *See Chelentis v. Luckenbach S.S. Co.*, 243 F. 536 (2d Cir. 1917), *aff'd*, 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918). With passage of the Jones Act, both the seaman and the longshoreman could sue the vessel in negligence, but the longshoreman could not sue the stevedore due to the continued viability of the fellow servant rule. However, this barrier soon fell as the Supreme Court construed the term "seaman" in the Jones Act to include longshoremen. *International Stevedoring Co. v. Haverty*, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926). Congress reacted to *Haverty* by enacting the LHWCA within six months.[10] It established the first workmen's compensation system for longshoremen and made it the exclusive remedy against the stevedore. This eliminated negligence suits by longshoremen against the stevedore, but it did not affect the right of longshoremen to proceed in negligence against third parties, including the vessel. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 100–102, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The final and most important remedy added to the longshoremen's arsenal prior to the 1972 amendments was the extension of the warranty of seaworthiness to longshoremen in *Seas Shipping Co. v. Sieracki*. This extension, which largely supplanted negligence actions against the vessel, until terminated by the 1972 amendments, was premised, as was the judicial extension of the Jones Act, on a determination by the Supreme Court that longshoremen and seamen worked under sufficiently similar conditions to warrant

8. The 1972 amendments to the LHWCA have been the subject of extensive study. Among the more pertinent articles discussing section 905(b) are the following: Gorman, *The Longshoremen's and Harbor Workers' Compensation Act—After the 1972 Amendments*, 6 J. Maritime L. 1 (1974); Hazen and Toriello, *Longshoremen's Personal Injury Actions Under the 1972 Amendments to the Longshoremen's and Harbor Workers Compensation Act*, 53 St. John's L.Rev. 1 (1978); Robertson, *Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers Compensation Act*, 7 J. Maritime L. 447 (1976); Thompson, *Duty Owed the Shipowner Under 1972 Amendments to Longshoremen's Act Is That of Land-Based Premises Owner to Business Invitee*, 6 J. Maritime L. 643 (1975); Comment, *Shipowner's Duties And Apportionment of Liability Under The Longshoremen's and Harbor Workers' Compensation Act*, 40 Fordham L.Rev. 323 (1978); Note, *The Injured Longshoreman vs. The Shipowner After 1972: Business Invitees, Land-Based Standards, and Assumption of Risk*, 28 Hastings L.J. 771 (1977); Comment, *The Vessel Owner's Standard of Care Under the 1972 Amendment to The Longshoremen's and Harbor Workers' Compensation Act*, 23 Loyola L.Rev. 986 (1977).

9. The Merchant Marine Act, 1920, ch. 250, 41 Stat. 988.

10. 33 U.S.C. §§ 901 *et seq.*; Act of March 4, 1927, ch. 509; 44 Stat. 1424.

the same legal protection. *Id.* at 90–100, 66 S.Ct. 872.

There are cogent reasons for turning to the standard of care owed seamen under the Jones Act for guidance in developing the standard of care to apply under section 905(b): the similarity of the work environments regulated by the Jones Act and section 905(b), the absence of assumption of the risk and contributory negligence as total bars to recovery under both the Jones Act and section 905(b), the absence of land-based status distinctions under the Jones Act, and the obvious usefulness of the body of case law precedent accumulated under the Jones Act.[11] *See* G. Gilmore & C. Black, Jr., *The Law of Admiralty,* 449–455 (2d ed. 1975).

Due to the historic availability of the negligence remedy in suits by longshoremen against the vessel, there exists a significant body of longshoremen's negligence law. Although the availability of the *Sieracki* seaworthiness doctrine greatly decreased reliance upon negligence from 1946 to 1972, the constancy of working conditions and employer-employee relationships in longshoring over the years makes this body of negligence law relevant today. The general rule concerning injuries received by long-shoremen who fell into the open holds of ships was that the vessel was not negligent in leaving cargo hatches open and unguarded to permit the loading of cargo. *See, e. g., Miller v. The Sultana,* 176 F.2d 203, 206 (2d Cir. 1949); *Ove Tysko v. Royal Mail Steam Packet Co.,* 81 F.2d 960, 962 (9th Cir. 1936); *Long v. Silver Line, Ltd.,* 48 F.2d 15, 16 (2d Cir. 1931). However, it was negligence for the vessel to leave cargo hatches open and unguarded on a working deck if the particular hatch was not to be worked. *See, e. g., Badalamenti v. United States,* 160 F.2d 422 (2d Cir. 1947); *The Omsk,* 266 F. 200 (9th Cir. 1920); *West India and P. S. S. Co. v. Weibel,* 113 F. 169 (5th Cir. 1902). In *Badalamenti,* a longshoreman was injured when he fell into an unguarded open hatch in an unlighted lower tween deck. The hatch had been left open by a carpentry crew under the control of the ship. The crew had closed the hatches of the upper decks. The longshoreman, part of a crew working an adjacent hatch, fell into the open hatch when he entered the darkened hatch in search of rope. In affirming the trial judge's finding that the vessel's negligence had been the sole cause of the longshoreman's injuries, the court said:

We think it was foreseeable that they might have occasion to go to parts of the

11. The cases that have rejected the incorporation of Jones Act negligence standards into § 905(b) did so either because of a belief that the humanitarian concerns prompting the extension of Jones Act negligence to longshoremen in *International Stevedoring Co. v. Haverty,* 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926), were satisfied by the 1972 amendments, *Griffith v. Wheeling-Pittsburgh Steel Corp.,* 384 F.Supp. 230, 235 n.3 (W.D. Pa. 1974), *rev'd on other grounds and remanded,* 521 F.2d 31 (3d Cir.), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), or because of a conclusion that the Jones Act standard established a higher standard of care than that permitted by § 905(b), *Citizen v. M/V TRITON,* 384 F.Supp. 198, 202 n.3 (E.D. Tex. 1974). Both decisions were premised on the assumption that we have already rejected, *i. e.,* that there can somehow be a difference between Jones Act negligence and any other kind of negligence that does not incorporate assumption of the risk and contributory negligence as total bars to recovery. For there to be negligence of any variety, there must be a failure to exercise reasonable care under the circumstances which causes harm.

By definition, the standard of care is dictated by the circumstances. The *Griffith* and *Citizen* courts appear to have been misled by the many cases that state that Jones Act negligence involves a higher standard of care than does common-law negligence because only the slightest evidence of negligence is required to sustain a Jones Act verdict. *See, e. g., Ferguson v. Moore-McCormack Lines,* 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957). Since neither the Jones Act nor § 905(b) may incorporate the doctrines of assumption of the risk and contributory negligence which are part of common-law negligence, there is no way the standards of care applicable to similar circumstances under both the Jones Act and § 905(b) could differ as long as both were negligence standards. In either case, the jury could find the vessel negligent only if there were some evidence that the harm was caused by a failure to exercise reasonable care under the circumstances. *See generally* U.S.Const. Amend. 7; *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 360, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962).

deck that were not lighted in pursuit of their calling. If they did, the open hatch was a great danger for it was not protected by any guardrail or ropes, or by any coaming sufficient to prevent an accident. It was not reasonable to suppose that stevedores would not be likely to go about the deck where they were working and not to foresee danger to them from an open hatch which was only about 50 feet away. As a distinguished court said in *Pioneer S. S. Co. v. McCann*, 6 Cir., 170 F. 873, 878: "It is hardly to be expected that men entering or working within a ship's hold will always keep within the exact parts of the hold where their employment, strictly construed, would call them."

The opinion of Judge Woods in *The Omsk*, 4 Cir., 266 F. 200, supports the view that some warning or protection against an open hatch was required in circumstances like those here, where the open hatch was in the control of the shipowner.

*Badalamenti v. United States*, 160 F.2d at 425. This well settled principle of longshoremen's negligence law is obviously applicable to the facts of the instant case.

We next consider the applicability of sections 343 and 343A of the Restatement. This court has previously construed the 1972 amendments to the LHWCA as mandating the development of a nationally uniform body of negligence law "derived from analogies to land-based tort concepts." *Anderson v. Iceland S.S. Co.*, 585 F.2d at 1146. Other courts have construed the 1972 amendments as requiring direct application of land-based tort concepts. *See, e. g., Hite v. Maritime Overseas Corporation*, 380 F.Supp. 222, 226 (E.D.Tex.1974).

The circuit courts of appeals that have considered the question of the applicability of land-based standards are divided into two schools of thought. A plurality of the circuits, following the lead of the Second Circuit in *Napoli v. Hellenic Lines*, 536 F.2d 505 (2d Cir. 1976), have either explicitly or implicitly adopted sections 343 and 343A of the Restatement (Second) of Torts as the standard of care owed longshoremen by the vessel. A minority of the circuits have rejected sections 343 and 343A, adopting instead a standard first developed by Judge Orrick in *Gallardo v. Westfal-Larsen & Co. A/S*, 435 F.Supp. 484 (N.D.Cal.1977). The one state supreme court to consider the issue has declined to utilize sections 343 and 343A. *Shepler v. Weyerhaeuser Co.*, 279 Or. 477, 569 P.2d 1050–52 (1977) (en banc).

The Second Circuit rule places upon the vessel a responsibility to provide a safe place to work, but that responsibility shifts when the stevedore assumes exclusive control of the workplace. *Lubrano v. Royal Netherlands S. S. Co.*, 572 F.2d 364 (2d Cir. 1978). Consequently, the vessel is liable when it has actual or constructive knowledge of dangerous conditions before the stevedoring operation begins and when it has actual knowledge of conditions that arise during stevedoring, but only if the vessel should anticipate that the longshoreman will be unable to protect himself against the unreasonable risk of harm. *Smith v. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789, 795 (2d Cir. 1979). Interestingly, a major reason for adoption of sections 343 and 343A by the Second Circuit was the superiority of those sections to section 340 of the Restatement of Torts, which the court found to be riddled with connotations of assumption of the risk and contributory negligence. *Napoli v. Hellenic Lines, supra*, 536 F.2d at 508. Although Judge Friendly has strongly criticized the attribution of "talismanic significance" to sections 343 and 343A by the courts, his criticism appears to have been concerned with the fact that those sections are in some situations more favorable to longshoremen than Judge Friendly believes Congress intended. *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682, 688 (2d Cir. 1978) (Friendly, J., dissenting).

The Fourth Circuit has specifically approved the use of section 343 and implied its approval of section 343A in longshoremen's actions against the vessel. In *Anuszewski v. Dynamic Mariners Corp., Panama*, 540 F.2d 757 (4th Cir. 1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545

(1977), the court affirmed the use of section 343 in a case in which the danger causing the injury was "open, obvious, apparent and known to the plaintiffs." *Id.* at 759. The court did not discuss section 343A, which deals specifically with open and obvious conditions and which is meant to be read in conjunction with section 343. *See* Restatement (Second) of Torts § 343, comment a. It adopted section 343A by implication in *Chavis v. Finnlines Ltd., O/Y,* 576 F.2d 1072 (4th Cir. 1978), when it stated its approval of adoption of that section by the Second Circuit in *Napoli.* However, the court declined to reach the issue in the case because it found the alleged error in the charge to be harmless. *Id.* at 1079–80.

Also relying on *Napoli,* the Fifth Circuit adopted sections 342, 343, and 343A in *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233, 1241–42 (5th Cir. 1977). As in *Napoli,* section 343A was found preferable to section 340 of the original Restatement because of section 340's incorporation of the doctrines of contributory negligence and assumption of the risk. *Gay v. Ocean Transport & Trading, Ltd., supra,* 546 F.2d at 1241–42. However, the *Gay* court tempered *Napoli* by noting that vessel owners do not have the identical duties of owners of land because "[a] ship presents its own special hazards. As always, a determination of the reasonableness of the defendant's actions (or lack thereof) requires an examination of all the circumstances surrounding the injury." *Id.* at 1242 n.20. *Gay* remains the law of the Fifth Circuit today. *See Wiles v.*

*Delta Steamship Lines, Inc.,* 574 F.2d 1338 (5th Cir. 1978); *Samuels v. Empresa Lineas Maritimas Argentinas,* 573 F.2d 884, 886 (5th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979).

Although the Seventh Circuit has not decided the question of the applicability of sections 343 and 343A to section 905(b) actions, it is one of the few circuits to address the alleged conflict between those sections and the section 905(b) prohibitions against the doctrines of assumption of the risk and contributory negligence. In *Clemons v. Mitsui O.S.K. Lines, Ltd.,* 596 F.2d 746 (7th Cir. 1979), the court assumed *arguendo* that section 343A applied and stated:

> [W]e read Section 343 together with Section 343A not as providing defenses but as defining when it is negligent to allow the existence of a dangerous condition. Under the Restatement, when the danger is open and obvious and in addition is avoidable in the exercise of ordinary care and therefore the harm is not foreseeable, it is not negligent to allow the danger to exist.

*Clemons v. Mitsui O.S.K. Lines, Ltd.,* 596 F.2d at 750 n.17. Thus, it appears that the Seventh Circuit will eventually adopt section 343A in some form. The only significant issue that remains in doubt is whether the circuit will adopt the qualifying clause "unless the [possessor] should anticipate the harm despite such knowledge or obviousness" of section 343A.[12] *See Matthews v.*

---

12. The *Clemons* court relied heavily on the decision of this court in *Stanley v. United States,* 476 F.2d 606 (1st Cir. 1973), in ruling that the "unless" exception of § 343A was not applicable because there was no evidence that the stevedore would employ careless workers or fail to take necessary safety precautions. *Clemons, supra,* 596 F.2d at 750. This is an excellent example of the pitfalls inherent in the use of § 343A in § 905(b) cases. In *Stanley,* this court applied Maine law in reversing a district court verdict premised on a finding that the government had negligently failed to supply guards around the holes or "cut-outs" in the work platforms of a radio tower. *See Stanley v. United States,* 347 F.Supp. 1088 (D.Me.1972). We noted that the "burden of establishing the exception should be substantial. Otherwise, since whenever a party has been injured the

warning has in fact been ineffective, there will be a danger of the exception being found to swallow up the rule." *Stanley v. United States,* 476 F.2d at 609 n.5. This rule, which we believe applies only on land, imposes a heavy burden on the plaintiff. The plaintiff must prove that the defendant should have known the plaintiff could not competently assume the risk associated with the known danger or would be negligent in dealing with the danger. Underlying this burden is the assumption that a landowner may allow the existence of an unreasonably dangerous condition on his land and may contract with persons for them to work around those dangers without incurring any liability, on the grounds that the contractors assumed the risk of working around those known dangers. The landowner would be liable only if it failed to warn the workers of

*Ernst Russ Steamship Co.*, 603 F.2d 676, 679 n.3 (7th Cir. 1979).

As noted earlier, the two circuit courts that have rejected sections 343 and 343A were strongly influenced by the opinion of Judge Orrick in *Gallardo v. Westfal-Larsen & Co. A/S*, 435 F.Supp. 484. In *Gallardo*, Judge Orrick modified the standard of care he had enunciated earlier in *Ramirez v. Toko Kaiun K.K.*, 385 F.Supp. 644 (N.D.Cal. 1974). In *Ramirez*, the court ruled that the vessel owed longshoremen "the same standard of care that a land based owner of a premises owes to a business invitee," including placing the vessel in such condition that an experienced stevedore exercising ordinary care would be able to perform his job in a workmanlike manner with reasonable safety and warning the stevedore of latent defects known to the vessel. *Id.* at 646. *Gallardo* transformed this section 343 and 343A standard of care into one more favorable to the longshoreman:

Before the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual or constructive knowledge. After the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual knowledge.

*Gallardo v. Westfal-Larsen & Co. A/S*, 435 F.Supp. at 490. The transformation of the standard of care resulted from Judge Orrick's conclusion that the land-based standards of care of sections 343 and 343A were antithetical to section 905(b). This conclu-

sion flowed from an analysis of the legislative history of section 905(b) and of the Restatement (Second) of Torts:

[T]he Restatement sections force courts to define a shipowner's standard of care under the amendments in terms of the plaintiff's perceptions of the danger posed by a given condition. The sections thus tend to foreclose a balanced inquiry into the reasonableness of a vessel's conduct under the circumstances of a particular case and tend to limit the liability of shipowners for their proven negligence. *See, e. g., Anuszewski v: Dynamic Mariners Corp., Panama*, 391 F.Supp. 1143, 1145 (D.Md.1975). The amendments, of course, permit limitations upon a plaintiff's recovery based upon the admiralty doctrine of comparative negligence. However, the amendments specifically reject any bar to recovery based upon contributory. negligence and assumption of risk. Yet, the authors of the Restatement clearly indicate that the contributory negligence of the plaintiff and assumption of risk have a direct bearing upon liability under Sections 343 and 343A. Restatement (Second) of Torts § 343, comment d; *id.* § 343A, comment d.

*Gallardo v. Westfal-Larsen & Co., A/S*, 435 F.Supp. at 494, Judge Orrick then confronted the issue of whether sections 343 and 343A merely define negligence, *see Clemons v. Mitsui O.S.K. Lines, Ltd.*, 596 F.2d at 750 n.17, or actually relieve the proprietor of land of responsibility for creation of an unreasonably dangerous condition:

The authors also state that whether or not courts conceive of a plaintiff's perceptions of a hazardous condition as relieving

latent conditions or if it oppressed them, such as by allowing them to work when the landowner knew or should have known the workers could not possibly avoid the danger.

While this may be a terrene rule of this court, the dictates of § ,905(b) would prohibit the creation of a second and similar rule for application upon navigable waters. By enacting § 905(b), Congress sought to focus attention on the amelioration of dangerous conditions on board ship. The rule in *Stanley*, as lowered into the ship by *Clemons*, focuses on the accu-

racy of the longshoreman's perception that he can avoid the danger. Once the stevedore and/or the longshoreman makes that decision under *Clemons*, the issue of the vessel's lack of care in allowing the condition to ·exist evaporates. There would be no balancing of the usefulness of the dangerous condition and the burden involved in curing it against the risk to others of its continued existence. The effect of this rule, contrary to the intent of Congress, is to allow the vessel to be protected from its negligence.

a defendant of proven liability or of pre-venting a finding of liability altogether, the effect of either analysis is the same. *Id.* § 496C, comment d. Defendants receive the benefit of a partial or absolute bar to liability having the characteristics of a defense based upon an implied assumption of risk.

*Id.* Judge Orrick concluded his rejection of the once-embraced sections 343 and 343A by discussing section 905(b) cases in which sections 343 and 343A were used as bars to recovery in contravention of the intent of Congress, and by adopting the reasonable care under the circumstances standard of *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). In adopting the *Kermarec* standard, Judge Orrick noted that "excessive reliance upon property distinctions for guidance in admiralty law complicates the task of satisfying the considerations contained in the House Report and, thereby, frustrates the intent of Congress to develop a body of admiralty negligence law under the 1972 amendments." *Gallardo v. Westfal-Larsen & Co., A/S*, 435 F.Supp. at 495.

The Ninth Circuit relied heavily on *Gallardo* in rejecting sections 343 and 343A in *Santos v. Scindia Steam Navigation Co., Ltd.*, 598 F.2d 480 (9th Cir. 1979). Citing the conflict between section 905(b) and the defenses of assumption of the risk and contributory negligence, the persuasiveness of *Kermarec* and the fact that section 905(b) never mentions such property distinctions as the term "invitee," the court adopted the following standard of care to implement section 905(b):

> A vessel is subject to liability for injuries to longshoremen working on or near the vessel caused by conditions on the vessel if, but only if, the shipowner (a) knows of, or by the exercise of reasonable care would discover, the conditions, and should realize that it involves an unreasonable risk of harm to such longshoremen, and (b) the shipowner fails to exercise reasonable care under the circumstances to protect the longshoremen against the danger.

*Santos v. Scindia Steam Navigation Co., Ltd.*, 598 F.2d at 485.

The Third Circuit first warned that it might be error to utilize sections 343 and 343A in section 905(b) cases in *Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1249 n.35 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). This warning was followed by a formal rejection of the sections in *Rich v. United States*, 596 F.2d 541, 551 n.21 (3d Cir. 1979), in which the court relied on *Hurst* and Judge Friendly's dissent in *Canizzo*. The court expanded upon this rejection recently in *Griffith v. Wheeling-Pittsburgh Steel Corp.*, 610 F.2d 116 (3d Cir. 1979), holding that sections 343 and 343A incorporate the prohibited defense of assumption of the risk. The *Griffith* court agreed it had accepted the Restatement as "the national expression of non-maritime tort principles," but declined to adopt principles of the Restatement which were inconsistent with congressional intent in enacting section 905(b). *Griffith v. Wheeling-Pittsburgh Steel Corp.*, at 125. Sections 343 and 343A conflict with that intent, the court reasoned, because both sections "would apparently relieve a vessel owner of all liability for an unreasonably dangerous condition on board ship if the invitee longshoreman has failed to exercise reasonable care in dealing with that danger, on the theory that a negligent invitee has assumed the risk of injury." *Id.* at 125. *See* Restatement (Second) of Torts § 343A, comment e. Instead, the court adopted the reasonable care under the circumstances standard of *Kermarec v. Compagnie Generale Transatlantique:*

> The sounder approach, we think, is to recognize that § 905(b) imposes on vessel owners the same duty to exercise "reasonable care under the circumstances of each case" that would be applicable to a land based business. *Accord, Santos v. Scindia Steam Navigation Co., supra,* 598 F.2d at 485–88; *Gallardo v. Westfal-Larsen & Co., A/S, supra,* 435 F.Supp. at 496. *See Kermarec v. Compagnie Generale Transatlantique, supra,* 358 U.S. at 632, 79 S.Ct. 406; *Brown v. Ivarans Rederi*

*A/S, supra,* 545 F.2d [854] at 863. *Cf.* Restatement (Second) of Torts §§ 281–83, 302A, 305, 452. Proceeding from this broad common law standard, federal courts may develop on a case by case basis a uniform federal law of negligence, referring for guidance to the "land based" standards of care established in the Restatement (Second) of Torts whenever such reference accords with the Congressional intent and is helpful to decision of the case at hand.

At a minimum, we think that the standard of reasonable care under the circumstances would permit a finding of negligence upon a showing: (1) that the vessel knew of or by the exercise of reasonable care could have discovered the condition on board ship that led to the injury; (2) that the vessel knew or should have known that the condition would pose an unreasonable risk of harm to longshoremen working on board ship; and (3) that the vessel failed to exercise reasonable care to protect the longshoremen against that danger.

*Griffith v. Wheeling-Pittsburgh Steel Corp.,* at 125–126.

■ Our review of the decisions of other courts in regard to section 905(b) has convinced us that sections 343 and 343A are too heavily laden with the prohibited defenses of assumption of the risk and contributory negligence to be followed rigidly as the standard of care owed longshoremen by the vessel under section 905(b). Accordingly, we hold that sections 343 and 343A and the rest of the Restatement (Second) of Torts may be utilized in developing the standard of care under section 905(b) only when purged of concepts antithetical to the recognized purpose of section 905(b).

From our review of the legislative history of section 905(b), the development of the pre-1972 maritime negligence law and the diligent but contradictory efforts of the courts to fashion a uniform national body of section 905(b) negligence law, we conclude that the standard of care under section 905(b) must reflect several important considerations.

First, the standard must fully implement the intent of Congress in enacting section 905(b). The standard must be designed to have the maximum positive impact on safety. Each party in the stevedoring triangle, including the vessel, must bear the cost of his own negligence. No party may be granted refuge in legal doctrines, such as seaworthiness, strict liability, assumption of the risk or contributory negligence, which foreclose inquiry into the reasonableness of that party's conduct under the circumstances. OSHA regulations are to be considered and may provide the appropriate standard of care in certain circumstances.

Second, to the extent this consideration does not conflict with expressed legislative policy, the standard of care should be consistent with the strong admiralty traditions of simplicity and practicality. *See Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. at 630 n.5–631, 79 S.Ct. 406; *The Lottawanna,* 88 U.S. (21 Wall.) 558, 575, 22 L.Ed. 654 (1874). Legal doctrines that cause confusion shipboard and in the courts must be jettisoned and replaced by standards which are both understandable and effective.

Third, within the parameters previously discussed, the courts should be free to borrow by analogy from existing bodies of law. These include land-based tort law as expressed in the Restatement, negligence law developed under the Jones Act and the negligence law developed in longshoring cases prior to the adoption of the 1972 amendments to the LHWCA. By use of such precedent, some degree of certainty of result and a great degree of judicial economy will be achieved. Moreover, it is appropriate that workers who form a human cargo bridge between sea and land should be governed by a body of law that incorporates the most relevant provisions of both maritime and terrene law.

Finally, standards developed to implement section 905(b) must reflect the fact that the LHWCA is a remedial statute enacted to protect the longshoreman and not the vessel. Doubt as to the interpretation of the Act and the development of stan-

dards of care implementing it must be resolved in favor of the longshoreman. *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979).

In light of these important considerations, we adopt as the standard of care owed longshoremen by the vessel the standard of care born in *Gallardo* and raised to maturity in *Santos* and *Griffith*.

The standard of reasonable care under the circumstances permits a finding of negligence upon a showing:

(1) that the vessel knew of or by the exercise of reasonable care could have discovered the condition on board ship that led to the injury;

(2) that the vessel knew or should have known that the condition would pose an unreasonable risk of harm to longshoremen working on board ship; and

(3) that the vessel failed to exercise reasonable care to protect the longshoremen against that danger.

■ Under this standard, the principal inquiry will be whether the vessel permitted the existence of a condition that posed an unreasonable risk of harm to the longshoreman. Whether the risk of harm was in fact unreasonable may be determined by balancing the usefulness to the ship of the dangerous condition and the burden involved in curing it against the probability and severity of the harm it poses. A useful example is provided by the House Report:

So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances.

*House Report* at 4704. Inherent in this analysis is a determination that spilled oil on the deck served no useful purpose and could have been easily cleaned up, but significantly increased the possibility that a person would fall and be injured and it was therefore, unreasonable for the vessel not to clean up the spill. This approach for determining the reasonableness of a shipboard danger is also reflected in the pre-1972 law concerning open cargo hatches. While it was negligence for a vessel to leave tween deck hatch covers open and the hatch unlighted and unguarded if the hatch was not to be loaded with cargo, the existence of the very same conditions did not constitute negligence if the cargo was to be loaded into the hatch, since an open hatch is essential to the task of loading and unloading a ship. *Compare Miller v. The Sultana*, 176 F.2d 203, 206, *with Badalamenti v. United States*, 160 F.2d 422, 425–26.

■ Once a danger is determined to have been unreasonable, the finder of fact will then determine whether the longshoreman's conduct was unreasonable. If it is found to have been unreasonable, the traditional admiralty doctrine of comparative negligence is then applied to place upon each party the cost of his own negligence. The Supreme Court has, of course, eliminated the stevedore as an involved party for comparative negligence purposes. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979).

Our decision to reject a blanket adoption of sections 343 and 343A is strengthened by the fact that the standard we use has been adopted by the two circuits to consider the issue most recently, *see Griffith v. Wheeling-Pittsburgh Steel Corp.*, 610 F.2d 116, (3d Cir. 1979); *Santos v. Scindia Steam Navigation Co., Ltd.*, 598 F.2d 480 (9th Cir. 1979), and that other circuits seem to be loosening their early grip upon sections 343 and 343A. *See Smith v. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789 (2d Cir. 1979); *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682 (2d Cir. 1978); *Wiles v. Delta Steamship Lines, Inc.*, 574 F.2d 1338 (5th Cir. 1978); *Samuels v. Empresa Lineas Maritimas Argentinas*, 573 F.2d 884 (5th Cir. 1978). Moreover, we

conclude from our review of the decisions of courts which have adopted sections 343 and 343A that those courts have, contrary to the wishes of Congress, placed a higher value on national uniformity in the law than upon the creation of a standard of care that will enhance safety on board ship.

An important factor in our adoption of a standard of care free of status distinctions was the guidance of *Kermarec.*

It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew. . . .

The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism. In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships, modern common-law courts have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowner owes to each. Yet even within a single jurisdiction, the classifications and subclassifications bred by the common law have produced confusion and conflict. As new distinctions have been spawned, older ones have become obscured. Through this semantic morass the common law has moved, unevenly and with hesitation, towards "imposing on owners and occupiers a single duty of reasonable care in all the circumstances."

For the admiralty law at this late date to import such conceptual distinctions would be foreign to its traditions of simplicity and practicality. *The Lottawanna,* 21 Wall. 558, at 575 [22 L.Ed. 654]. The

incorporation of such concepts appears particularly unwarranted when it is remembered that they originated under a legal system in which status depended almost entirely upon the nature of the individual's estate with respect to real property, a legal system in that respect entirely alien to the law of the sea. *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. at 629–31, 79 S.Ct. at 409–410.

Moreover, even in land-locked jurisdictions, the trend is toward the abolition of status distinctions in the common law and the adoption of the single duty of reasonable care under the circumstances.[13]

A final factor influencing our adoption of the new standard of care is that use of sections 343 and 343A alone would have left longshoremen in a position considerably inferior to that enjoyed prior to the adoption of the 1972 amendments. Since a rigid application of sections 343 and 343A is generally more favorable to the vessel than the previous maritime negligence rule because of the presence of status distinctions and connotations of assumption of the risk and contributory negligence, those sections should not be made the basis of the standard of care without an explicit indication that Congress so intended. As stated by the Supreme Court in *Edmonds,* "we must reject a 'theory that nowhere appears in the Act, that never was mentioned by Congress during the legislative process, that does not comport with Congress' intent, and that restricts . . . a remedial Act . . .' " (citations omitted). *Edmonds v. Compagnie Generale Transatlantique, supra,* 443 U.S. at 271, 99 S.Ct. at 2762. *See also Cooper Stevedoring Co. v. Fritz Kope, Inc.,* 417 U.S. 106, 112, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974); *Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp.,* 342 U.S. 282, 285–86, 72 S.Ct. 277, 96 L.Ed. 318 (1952).

---

13. *See, e. g., Rowland v. Christian,* 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (1968); *Mile High Fence Co. v. Radovich,* 175 Colo. 537, 489 P.2d 308 (1971) (en banc); *Pickard v. Honolulu,* 51 Haw. 134, 452 P.2d 445 (1969); *Ouellette v. Blanchard,* 116 N.H. 552, 364 A.2d 631 (1976); *Basso v. Miller,* 40 N.Y.2d 233, 386 N.Y.S.2d 564, 352 N.E.2d 868 (1976); *Marioenzi v. Joseph DiPonte, Inc.,* 114 R.I. 294, 333 A.2d 127 (1975); *Smith v. Arbaugh's Restaurant, Inc.,* 152 U.S.App.D.C. 86, 469 F.2d 97 (D.C.Cir. 1972), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2774, 37 L.Ed.2d 399 (1973).

## THE JURY CHARGE

In evaluating the charge, we review the entire charge. If the charge fairly and accurately states the law, affirmance is required. Since we observed early on in this opinion that the charge to the jury was comprised mainly of the concepts contained in sections 343 and 343A, and have also concluded that those sections do not state the standard of care applicable to suits under section 905(b), it follows that the charge was to that extent erroneous. However, since we have also found sections 343 and 343A to be more favorable to the vessel than the proper standard of care, the district court's error was harmless. If the jury found the vessel solely negligent while utilizing sections 343 and 343A as the standard of care, it would also have found the vessel solely negligent under the standard of care adopted today by this court. *See generally Chavis v. Finnlines Ltd., O/Y,* 576 F.2d at 1080; *Riddle v. Exxon Transp. Co.,* 563 F.2d 1103, 1112 (4th Cir. 1977).

The remaining question in regard to the charge is whether the district court erred in not including the vessel's requested instructions in the charge. Requests 3, 23 and 24 [14] were correct statements of the law, but none of the requests in the form given the court were relevant to the issues of the case. The district court was correct in refusing to charge the jury by quoting statements apparently taken from appellate opinions, but not tailored to the facts of this case. *Matthews v. Ernst Russ Steamship Co.,* 603 F.2d 676, 682 (7th Cir. 1978). In addition, Request No. 23 improperly assumed that the stevedore was negligent in failing to provide proper lighting and that hatch No. 3 was a work area. These were issues for the jury. Moreover, the district court included in the charge points of law upon which the vessel constructed requests 3, 23 and 24.

Request 26 [15] was an incorrect statement of law. It attempted to relieve the vessel of the burden of failing to exercise reasonable care in leaving the hatch covers open, the hatch opening unguarded and that hatch unlighted by interposing the alleged negligence of the stevedore. Even if the stevedore were negligent in failing to correct a dangerous condition known to the vessel and found by the stevedore upon boarding the ship, that would not relieve the vessel of its negligence in allowing the dangerous condition to exist. As the *Griffith* court observed, "[i]t is inconceivable to us that the [Supreme] Court, which disapproved a rule that imputes the negligence of the stevedore to the longshoreman to reduce his recovery against a negligent shipowner, would approve a rule barring all recovery against a negligent shipowner on the basis of imputed employer negligence." *Griffith v. Wheeling-Pittsburgh Steel Corp.,* at 125.

There is no duty on the ship to supervise or oversee the work of the stevedores in loading the cargo.
*Munoz v. Flota Mercante Gran Columbia S.A.,* (CA 2 1977), 553 F(2)[2d] 837."

15. Request 26 reads as follows:
"26. If you find that the darkness of hatch No. 3, the absence of lighting therein, and the fact that the hatch lids were in the open position, were open and obvious conditions and the shipowner reasonably expected the stevedore in the ordinary course of its work to supervise its personnel and keep them from entering the darkened area, then the stevedore is in the best position to abate the danger and the shipowner is not liable.
*Guerra v. Bulk Transport Co.* (CA 5 1977), 546 F(2)[2d] 233 [1233].
*Cox v. Flota Mercante Gran Columbia S.A.,* (CA 2 1978), 577 F(2)[2d] 798."

14. Requests 3, 23 and 24 read as follows:
"3. The jury is instructed that the defendant is entitled to delegate the performance of the stevedoring work to an independent stevedoring contractor. Therefore the defendant is not responsible for the conduct of the stevedoring contractor.
*Riddle v. Exxon Trans. Co.* (CA 4 1977), 563 F(2)[2d] 1103."
"23. The major responsibility for furnishing a safe place to work is on the stevedore. The ship is not liable for the negligence of the stevedore in failing to provide sufficient lighting in the work area.
*Cox v. Flota Mercante Gran Columbia S.A.* (CA 2 1978), 577 F(2)[2d] 798.
*Munoz v. Flota Mercante Gran Columbia S.A.* (CA 2 1977), 533 F(2) 837.
*Brown v. Ivarans Rederi A/S,* (CA 3, 1976), 545 F(2) 854."
"24. The loading of the cargo was under the direction and control of the longshoremen who were performing all of the work.

Request 29[16] also was an incorrect statement of the law. As the Second Circuit ruled in *Badalamenti v. United States*, 160 F.2d at 425, it is negligent for the vessel to leave hatch covers open and unguarded in an unlighted hatch area adjacent to a work area because it is foreseeable that longshoremen would utilize such an area during their work. The vessel acknowledged the wisdom of this rule when its expert witness on marine safety, Captain George Roscoe, testified that not even ropes across the openings in the bulkheads would keep longshoremen from entering an unlighted hatch adjacent to a work area.

## MOTIONS FOR JUDGMENTS N.O.V. AND NEW TRIAL

In determining whether the district court erred in denying the vessel's motion for judgment n. o. v., we must view the evidence in the light most favorable to Johnson and determine whether "there are facts and inferences reasonably drawn from those facts which lead to but one conclusion." *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 989 (1st Cir. 1978). We may neither weigh credibility nor resolve conflicting testimony. *Id.* at 990. Utilizing these standards, we find that the jury could reasonably have found that the hatch covers on the No. 3 tween deck of the M/V SALVADOR were left open by a crew under the control of the ship, that the hatch opening was left unguarded and the hatch was left unlighted, that the vessel was reminded of this condition prior to the commencement of work by the signalman in No. 2 hatch and that the vessel should have reasonably expected longshoremen working in adjacent hatches to enter No. 3 hatch and fall into the opening in the tween deck created by the opened hatch covers. The district court did not err in denying the motion for judgment n. o. v. *Roche v. New Hampshire National Bank*, 192 F.2d 203 (1st Cir. 1951); 9 Wright & Miller, Federal Practice and Procedure §§ 2524, 2540 (1971).

A motion for a new trial is directed to the sound discretion of the trial court and will be reversed only for abuse of that discretion. *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d at 990. In considering a motion for a new trial based on an allegation that a verdict is against the weight of the evidence, the trial court will be found to have abused its discretion only if it refused to grant a new trial when the verdict was against the clear weight of the evidence. *Id.* at 990–91. 6A Moore's Federal Practice ¶ 59.08[5] at 59–152 through 59–165 (2d ed. 1974). We do not find the verdict to have been against the clear weight of the evidence.

*Affirmed.*

---

**16.** Request 29 reads as follows:

"29. You are instructed that when a shipowner relinquishes control of the hold, in which the longshoremen are assigned to work, in a reasonably safe condition to an experienced stevedore pursuant to a contract to supply services within its normal competence and the stevedore's negligence in failing to properly supervise its personnel and to keep them in the assigned work area, and in failing to keep them from entering a darkened, unused area proximately causes an injury to the plaintiff, then the jury's verdict will be for the defendant. *Munoz v. Flota Mercante Gran Columbia S.A.*, (CA 2 1977), 553 F(2)[2d] 1103."