John THOMAS, Plaintiff,

v.

Jadranska Slobodna
PLOVIDBA, Defendant.

COMMERCIAL UNION INSURANCE
COMPANY and Meehan Seaway
Service, Ltd., Plaintiffs,

v.

Jadranska Slobodna
PLOVIDBA, Defendant.

Nos. 82–C–1583, 83–C–0491.

United States District Court,
E.D. Wisconsin.

Jan. 29, 1987.

As Amended Feb. 2, 1987.

James E. Culhane and Michael P. Dunn, Milwaukee, Wis., for plaintiff.

Robert L. Elliott, Milwaukee, Wis., for defendant.

## MEMORANDUM AND ORDER

WARREN, Chief Judge.

This maritime personal injury action, commenced on December 15, 1982, pursuant to Section 933 of the Longshoremens and Harbor Workers-Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*, arises from the events of July 1, 1980. On that date, plaintiff John Thomas ("Thomas"), then a 52–year-old employee of Meehan Seaway Service, Ltd. ("Meehan"), suffered injuries to his right knee when he was struck by a falling Taylor forklift truck ("Taylor") aboard the M/V BIOKOVO ("BIOKOVO"). The BIOKOVO is a Yugoslavian flagship owned by defendant Jadranska Slobodna Plovidba which was docked at the Port of Milwaukee when the aforementioned accident occurred. Consequently, this matter lies within this Court's admiralty and maritime jurisdiction. It should be noted that the BIOKOVO was destroyed by fire approximately one month after the accident.

Because of injuries incurred on July 1, 1980, Thomas received $79,350.56 in worker's compensation benefits from Fireman's Fund Insurance Company ("Fireman's Fund"), Meehan's worker's compensation insurance carrier. Further, Fireman's Fund incurred $11,379.29 in medical and rehabilitation related expenses. Consequently, Fireman's Fund, although not a named party, has a subrogation lien for $90,729.85 under the LHWCA.

Other plaintiffs in this consolidated action include Commercial Union Insurance Company ("Commercial Union") and Meehan. The former possesses a subrogation claim for repairs to Meehan's forklifts in the amount of $12,923.50 and the latter has a claim of $1,000.00 pursuant to its deductible with Commercial Union. A five-day trial to the Court was held commencing November 12, 1985. Both parties have submitted proposed findings of fact and conclusions of law, and memorandum briefs in support of their respective posi-

tions. The following constitutes the Court's findings of fact and conclusions of law.

## APPLICABLE LAW

The parties agree that the Supreme Court's ruling in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), sets forth the pertinent law regarding a shipowner's and stevedore's liability for injuries incurred by longshoremen during a cargo operation. In *Scindia,* the Supreme Court held that a shipowner has a duty to have the ship and its equipment in such condition that the stevedore may carry on its cargo operations with reasonable safety. The shipowner is liable for negligence if he fails at least to warn the stevedore of hidden danger which was known to the shipowner, or should have been known to him in the exercise of reasonable care, and this hidden danger causes injury to a longshoreman. Once the stevedore's cargo operations have begun, the shipowner has no general duty to exercise reasonable care to discover dangerous conditions developing within the confines of the stevedore's cargo operations. However, during the cargo operations, the shipowner has a duty to act where the stevedore's exercise of judgment was so obviously improvident that the shipowner, if it knew of the dangerous condition, should have realized that this condition presented an unreasonable risk of harm to the longshoremen. Under such circumstances, the shipowner has a duty to intervene and rectify the dangerous condition.

Various courts have applied and developed the ruling in *Scindia.* In *Cameron v. Consolidated Grain and Barge Co.*, 654 F.2d 468 (7th Cir.1981), the Seventh Circuit found that the plaintiff longshoremen could not recover under the LHWCA from the shipowner for injuries allegedly sustained while working on the ship, absent proof of the owner's actual or constructive notice of the condition to which the longshoremen's injuries were attributed. The Fifth Circuit, in *Stass v. American Commercial Lines,*

*Inc.*, 720 F.2d 879 (5th Cir.1983), described the shipowner's duties post-*Scindia* regarding dangerous conditions that are "open and obvious" to the longshoremen working aboard a ship:

> Under the "new regime" of [*Scindia*] [citations omitted] the shipowner has no defense that the hazard was ɔ "open and obvious" to the longshoreman that he either was contributorily negligent or assumed the risk of the hazard by continuing to work. [Citations omitted]. This is so because when faced with an openly dangerous shipboard condition, the longshoreman's "only alternatives would be to leave his job or face trouble for delaying the work." [Citations omitted]. In short, "a longshoreman's own knowledge of a shipboard hazard will not negate a shipowner's duty of care which would exist otherwise." [Citations omitted].

720 F.2d at 882; *see also Johnson v. A/S IVARANS REDERI,* 613 F.2d 334 (1st Cir. 1980), *cert. dismissed,* 449 U.S. 1135, 101 S.Ct. 959, 67 L.Ed.2d 325 (1981); *Munoz v. Flota Merchante Grancolumbiana, S.A.,* 553 F.2d 837 (2d Cir.1977).

## PRE–ACCIDENT EVENTS AND CIRCUMSTANCES

Defendant is a Yugoslavian corporation which, on July 1, 1980, was the owner of the BIOKOVO. On June 26, 1980, the BIOKOVO docked at the Port of Milwaukee, Wisconsin, at Terminal 4. Pursuant to a previous engagement, Meehan provided stevedoring services to the BIOKOVO on July 1, 1980. On that date, at approximately 1:00 p.m., John Thomas, Fletcher Brantley, John Brodie, James Redd, John Boston and Ladale Kern, all longshoremen employed by Meehan, were assigned to and commenced stowing logs into the hold of Hatch No. 2 using the BIOKOVO's winches located at the forward end of Hatch No. 2. The hold of Hatch No. 2 is rectangular in shape and has wings which extend beneath the hatch coaming on the forward, port, starboard and aft (rear) sides of the hatch.

On July 1, 1980, James Grandberry, a Meehan employee and crane operator, was

assigned to load logs into the hold of Hatch No. 3 using the BIOKOVO's crane located between Hatch No. 2 and Hatch No. 3. Grandberry commenced work on Hatch No. 3 at approximately 1:00 p.m. Prior to commencing the loading operation, a member of the BIOKOVO crew informed Grandberry that there was a 1–2 log load limit on the crane. The crane operated by Grandberry was a "Stevedore 1055 Model" electro-hydraulic crane mounted on a rotating pedestal. The pedestal permitted the crane to service the holds of Hatch No. 2 and Hatch No. 3. This crane, manufactured by Stothert & Pitt, Ltd. of Bath, England, had a safe load lifting capacity of 10 long tons or 22,000 lbs. at a 55–foot radius. The various crane movements are achieved by the use of hydraulic pressure produced by various hydraulic pumps which in turn are powered by an electric motor.

Twice during Grandberry's stint in operating the crane on July 1, 1980, the crane's electric motor failed. On both occasions crew members of the BIOKOVO attempted to repair the crane and upon completing the repair work informed Meehan that the crane was ready for use.

The crane is equipped with a hoist brake which serves as a holding and emergency brake. The hoist brake is a spring applied, normally-on, caliper disc brake. The brake is hydraulically released by hydraulic fluid pressure directed through a solenoid valve which is controlled by a micro-switch fitted to the crane's hoist lever. The hoist lever is a three position mechanical linkage controlling the hoisting and lowering of the crane's cargo hook. The hoist lever is spring loaded such that when it is released, it returns to the neutral position. To hoist a load, the hoist lever is pulled back by the crane operator. Conversely, to lower a load, the hoist lever is pushed away from the crane operator.

The operation of the micro-switch is such that when the hoist lever is moved away from the neutral position in either direction, the solenoid valve is energized to permit hydraulic fluid to flow to, and open, the brake cylinder. Conversely, when the hoist lever is returned to neutral, the solenoid valve is de-energized so as to exhaust the fluid trapped between the solenoid valve and hoist brake cylinder back to the reservoir thereby allowing the hoist brake to apply almost instantaneously. The solenoid valve also de-energizes upon a failure of the electric motor. (Plaintiff's Exh. 10, Instruction Manual, page 2.11 at paragraph 67).

At approximately 3:30 p.m. on July 1, 1980, Joe West, a Meehan employee and crane operator, relieved Grandberry as operator of the crane. In operating the crane, both Grandberry and West experienced the crane's tendency to "drift"—that is, a slow and gradual lowering of the load—while the crane's hoist lever was in the neutral position. After West loaded a few logs into Hatch No. 3, Frank Evans, West's signal man, motioned for West to swing the crane to the dock to attach a bridle for removing the two forklift trucks out of Hatch No. 2. These forklift trucks were no longer needed in Hatch No. 2 because Thomas and his gang had completed stowing logs under the wings of the forward, port and starboard sides of the hold, leaving open only the center square. Before the crane was used to raise the Taylor out of the hold, Bob Word, Meehan's ship supervisor for the stevedore crew, inquired of the BIOKOVO's third officer whether it would be necessary to do anything to the crane to enable it to lift the Taylor. The officer replied that nothing need be done to the crane.

Ladale Kern, the driver of the Taylor forklift, positioned the Taylor directly under the fall of the crane at the center of the hold near the aft wall and pointed the forklift toward the forward end of the hatch. John Boston, the driver of the other forklift truck within Hatch No. 2—the Caterpillar forklift truck ("Caterpillar")—positioned the Caterpillar next to the Taylor toward the starboard side of the hold. West raised the boom of the crane to increase the crane's lifting capacity and lowered the four-legged bridle into the hold. Thomas, Brodie, Redd and Brantley each

placed a hook on each leg of the bridle into one of the four eye pads on the Taylor. Evans gave West the signal to tighten up on the chains to insure that the hooks were properly in place. After Thomas and his gang visually inspected the bridle to ensure everything was in place, Evans yelled "heads up" and gave West the signal to hoist the Taylor above the coaming. As West hoisted the Taylor, Thomas, Boston, Brantley and Brodie edged toward the coaming on the starboard side of the hatch while maintaining eye-contact with the ascending load.

When West had hoisted the Taylor to a point about three feet above the level of the hatch coaming, Evans signaled West to put the hoist lever in neutral and walked over to the ship's railing to see if all was clear on the dock. While West waited for Evans to signal him to swing the Taylor to the dock, the Taylor began to drift back into the hold at a faster than normal rate. With the assistance of Word, who had taken over for Evans as signal man, West reapplied hoist pressure and once again raised the Taylor to a point approximately three feet above the level of the hatch coaming. Maintaining slight hoist pressure to stabilize the load at a level approximately three feet above the hatch coaming, West engaged the slew lever and began to slew the Taylor toward the dock. West slewed the Taylor to a point approximately above the edge of the starboard hatch coaming when he heard the crane's electric motor shudder and begin to cut out. The electric motor again shuddered whereupon it then cut out. The Taylor fell onto the hatch coaming, teetered on the hatch coaming for approximately four to five seconds, during which time two of the bridle hooks attached to the right side eye pads on the Taylor came out.

While the load was teetering on the hatch coaming, the crane's brake was engaged, however, it was unable to restrain the load's drifting and, further, was unable to prevent the load's ultimate fall into Hatch No. 2. Indeed, if the crane's brake was off when the Taylor hit the hatch coaming, whichever direction the Taylor first teetered it would have continued to fall in that direction.

When the Taylor fell to the coaming edge, Thomas had positioned himself in the bottom of Hatch No. 2 on the starboard side near the edge of the hatch opening but out into the hatch opening so that he could maintain eye-contact with the Taylor. While the Taylor maintained its precarious teetering state, Thomas remained on the starboard side of the hold. Sometime during this four to five second interval, Thomas moved as far as he was physically able to under the hatch coaming on the starboard side. Following this brief interval, the Taylor fell into Hatch No. 2, the right side of the Taylor facing down toward the floor of the hold. The falling Taylor crashed into the Caterpillar forklift, positioned on the hold's starboard side, and struck and injured Thomas before coming to rest.

### INJURY

Thomas was lifted out of Hatch No. 2 by stretcher and transported to St. Luke's Hospital in Milwaukee. Upon admission to St. Luke's Hospital, Thomas complained to Dr. Edward Rath of discomfort on the left side of his face and jaw, his left shoulder, arm and hand, and pain in both legs, most prominently in the right knee.

On July 1, 1980, Dr. Rath performed exploratory surgery to ascertain the extent of damage to Thomas' right knee. That surgery revealed a complete tear of the anterior cruciat ligament and medial collateral ligament, and a partial tear of the knee capsule and medial semi-lunar cartilage. The anterior cruciat ligament was damaged beyond repair. The anterior cruciat ligament and the medial collateral ligament are two of four major ligaments which provide support and stability to the knee. In an attempt to reconstruct Thomas's knee, Dr. Rath repaired the knee capsule, repaired the torn medial collateral ligament in all three layers, inserted a matallic staple to anchor the repaired medial collateral ligament to the knee joint, and removed the

portion of torn medial semi-lunar cartilage. To reinforce the repairs made to the medial collateral ligament, Dr. Rath transferred anteriorly a portion of the medial hamstring tendon. After surgery, the right leg was immobilized in a long-leg cast with the knee about 25–30 degrees of flexion, which is optimum for medial collateral ligament repair.

On July 18, 1980, Dr. Rath removed the cylinder cast on Thomas' right leg, inspected the wound, removed the sutures from the operation, placed the leg in extension for optimum healing and immobilized the leg in another cylinder cast. Dr. Rath removed the cast on September 23, 1980, and placed Thomas on a program of supervised and non-supervised physical therapy aimed at improving strength and stability about the knee. The physical therapy consisted primarily of whirlpool treatment, electrical stimuli to the knee and lifting weights attached to the right ankle. In the period between September 23, 1980 and June 30, 1981, Dr. Rath periodically examined Thomas to monitor his progress. During this period, Thomas exhibited medial ligament instability, atrophy of the right quadricep and occasional fluid on the knee joint.

On June 30, 1981, in relation to Thomas' worker's compensation claim, Dr. Rath examined Thomas to ascertain the extent of disability of the right leg. Thomas' knee continued to exhibit definite medial ligament instability and atrophy of the right quadricep muscle. The range of flexion on the right knee was approximately 35 degrees less than on the left knee. Based on the instability of the knee, the atrophy of the right quadricep muscle and the limitation of motion, Dr. Rath determined Thomas' right knee to have a permanent partial disability of 30 percent as compared to disarticulation (amputation) at the knee.

As of July 1, 1981, Thomas was capable of returning to sedentary employment with physical restrictions of intermittent walking of one hour, no lifting, bending, squatting, climbing, kneeling, or twisting, with no hand restrictions, with no grasping restrictions or restrictions on use of his hands or shoulders, and with no sitting restrictions.

## LIABILITY

Plaintiffs bear the burden of proving by a preponderance of evidence that the damages plaintiffs sustained proximately and causally flowed from defendant's breach of its duty to exercise due care under the circumstances. *Porter v. American Export Lines, Inc.*, 387 F.2d 409 (3rd Cir. 1968). Based on the credible evidence presented at trial, the Court finds that defendant provided Meehan with a crane in an unreasonably dangerous condition. Specifically, as detailed above, defendant supplied Meehan with a crane possessing a defective braking mechanism in that the brake was incapable of restraining the Taylor from falling into the hold after the crane's electric motor cut out on the afternoon of July 1, 1980. Further, the Court finds that the defendant knew or should have known that the crane was in an unreasonably dangerous condition when it was provided to Meehan for use in the July 1, 1980 cargo operations aboard the BIOKOVO. This finding stems from three considerations. First, probative of the defendant's knowledge is the fact that defendant placed a 1–2 log load limit on the crane in Meehan's use of it for the cargo operations. This fact, coupled with the testimony of the July 1, 1980 crane operators that they experienced the crane's "drifting" effect upon the commencement of the July 1 cargo operations, indicates that defendant knew of the crane's deficient brakes.

Second, the crane's two breakdowns on July 1, 1980 prior to the accident and the BIOKOVO crew's attempts to repair the crane, indicate that the defendant was aware of the crane's improper working condition. The crane's first electric motor failure occurred when Grandberry attempted to lift the crane's cargo hook off the dock to attach cables for the first load of logs. Crew members of the BIOKOVO were notified of the crane stoppage and attempted to repair the electric motor. After approximately fifteen to twenty minutes, the crew

members restarted the crane and informed Meehan that it was safe for use. The second electric motor failure occurred when Grandberry attempted to swing the cargo hook over to the dock to pick up another load of logs. The second failure occurred approximately one hour and fifteen minutes after the first failure, or at approximately 2:30 p.m. Once again BIOKOVO crew members, including at least two of the same crew members who worked on the crane after the first failure, worked on the crane in an attempt to effectuate repairs to the electric motor. After approximately forty-five minutes to one hour, the crew members again restarted the crane and informed Meehan and its employees that the crane was okay for further use. These facts are probative of the defendant's knowledge of the crane's dangerous condition.

Finally, the testimony of plaintiff's expert, Edward McClean, establishes in the Court's view that the crane's brakes failed to function properly on July 1, 1980 because of worn brake pads. The crane's brakes, including the brake pads, were not inspected or repaired for at least five weeks prior to the July 1, 1980 accident. The instruction manual for the crane states that the brakes and brake pads should be checked weekly. (Plaintiff's Exhibit 10 at page 5.1, paragraph 3D). Mr. McClean testified that the brake pads could not have worn out during the July 1, 1980 cargo operation and that "drifting" increases the wear and tear on the brake pads.

■ The Court finds that these facts establish that defendant should have known of the crane's unreasonably dangerous condition when it was provided to Meehan on July 1, 1980. This defective braking mechanism rendered the crane unreasonably dangerous and, further, it proximately caused Thomas' injuries pursuant to the accident of July 1, 1980. Likewise, this defective braking mechanism proximately caused the damage to Meehan's two forklifts.

Issues remain as to the contributory negligence of Thomas and Meehan. Defendant contends that Thomas was contributorily negligent in failing to exercise ordinary care and that this failure was a cause of his injury. Specifically, defendant contends that Thomas carelessly failed to secure a safe position out of harm's way while the Taylor forklift was being lifted from the hold. Further, defendant maintains that when the Taylor neared the climax of its ascent and fell to the coaming edge, teetering on the edge for approximately four to five seconds, Thomas failed to take appropriate evasive action during this interval.

■ The established admiralty doctrine of comparative negligence provides that "contributory negligence, however gross, is not a bar to recovery but only mitigates damages." *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939). As to a longshoreman's suit against a shipowner, "a longshoreman's award in a suit against a negligent shipowner would be reduced by that portion of the damages assignable to the longshoreman's own negligence; but, as a matter of maritime tort law, the shipowner would be responsible to the longshoreman in full for the remainder, even if the stevedore's negligence contributed to the injuries." *Edmonds v. Compagnie Generale Transatl.*, 443 U.S. 256, 259–60, 99 S.Ct. 2753, 2756, 61 L.Ed.2d 521 (1979).

■ The Court finds no contributory negligence on Thomas' part. While the crane was being lifted out of Hatch No. 2, and prior to its fall onto the coaming edge, it is undisputed that Thomas maintained eye contact with the ascending load. Further, all parties agree that such maintenance of eye contact would be the appropriate precaution taken by Thomas under the circumstances. To maintain such eye contact, Thomas necessarily was precluded from completely leaving the four edges of the square of the hatch coaming. At his deposition and again at trial, Thomas testified that he positioned himself at the edge of the square of the hatch during the Taylor's ascent. Such positioning, coupled with Thomas' maintenance of eye contact,

and in light of the circumstances existing at the time—a load properly ascending and portending no sign of its imminent crash—compels the Court to conclude that no contributory negligence can be assigned to Thomas for the manner in which he observed the Taylor's ascent out of the hold.

■ The Court finds likewise as to defendant's contention that Thomas was contributorily negligent in failing to take effective evasive action while the Taylor was teetering on the hatch coaming. When the crane's electric motor ceased operating, the Taylor fell to the hatch coaming, teetered on the coaming for four to five seconds and then fell into the hold. During this interval, Thomas and the other crew members scrambled as far under the hatch wings as they could. The wings were filled with logs thereby restricting a complete escape from danger. Defendant would have the Court find that during the four to five second interval while the Taylor was teetering precariously on the hatch coaming, Thomas should have darted across the open square of the hold to the hold's opposite side so as to reduce his exposure to the falling load.

The Court cannot find that a reasonably prudent person would have undertaken such action. While the Taylor was teetering on the hatch coaming, there was no knowing how long until it would fall into the hold. As events transpired, an interval of four to five seconds passed before the Taylor's fall—an interval sufficient in length to permit Thomas to dash to the hold's other side. However, when the Taylor fell to the hatch coaming, Thomas could not have known that he would have four to five seconds before the Taylor's fall into the hold. The interval could have been a fraction of a second, or it could have been as long as a minute or so. As such, Thomas did not act with imprudence in failing to dart across the open square of the hold, and thus exposing himself to even greater danger, to reach the safer confines of the hold's other end. Further, any attempt to sprint across the hold would have been hindered by the Caterpillar's presence in the hold.

Defendant also contends that Thomas' and Commercial Union's recovery should be reduced by Meehan's contributory negligence in (1) continuing with the stevedoring activities after learning that the crane was malfunctioning and (2) in using the ship's crane to lift out the forklifts rather than using the land-based City crane which was previously used to place the forklifts into the hold. The parties have stipulated that the forklifts owned by Meehan were damaged in the accident in the amount of $13,923.50—$1,000.00 of which was paid by Meehan and the remainder paid by Meehan's property damage insurance carrier, Commercial Union. By virtue of that payment, Commercial Union is subrogated to Meehan's claim for the property damage.

■ The Court finds that Meehan was contributorily negligent to the extent of 20% in using the BIOKOVO's crane to lift the Taylor out of the hold on July 1, 1980. This finding stems from the recognition of the various factors giving Meehan notice that the ship's crane may be incapable of handling the load. Specifically, the load limitation placed on the crane, the crane's tendency to "drift", and the crane's previous engine failures warned Meehan that the ship's crane may not be capable of lifting the Taylor out of the hold. These factors, notwithstanding defendant's assurance that the crane could handle the load, establishes Meehan's contributory negligence.

Moreover, Meehan apparently was not presented with a situation where it had no other option but to retrieve its forklifts out of the BIOKOVO's hold with the ship's crane. As mentioned above, a 200 ton land-based City crane was used to place the forklifts into Hatch No. 2. Ostensibly, this crane could have been used to retrieve the forklifts from the hold. However, in doing so, Meehan would have had to pay $125–$150 per hour for such use of the City's crane. *Trial Testimony of Robert Word* at 43–44.

Accordingly, Commercial Union may recover **$10,338.80** ($12,923.50 less 20%) as damages and Meehan may recover **$800.00** ($1,000.00 less 20%) as damages.

Defendant also contends that any recovery by Fireman's Fund should be reduced in porportion to the contributory negligence of Meehan. Fireman's Fund's recovery stems from its worker's compensation payments to Thomas, made pursuant to Meehan's statutory obligations as Thomas' employer. As such, these payments were not made pursuant to any assessment of liability for Thomas' injuries.

The law is clear that "the stevedore retains a lien in an amount equal to the sum of its compensation payments." *Johnson v. Sioux City & New Orleans Barge Lines*, 629 F.2d 1244, 1246 (7th Cir. 1980). Defendant cites to no statutory or case authority supporting its position that Meehan's lien should be diminished because a portion of fault for the subject accident is attributed to it. Indeed, as discussed above, the opposite is true. *Edmonds, supra* (even where the stevedore's negligence contributes to the longshoreman's injuries, the shipowner is responsible in full). The Court refuses to diminish any recovery for the subject lien because of Meehan's negligence.

### THOMAS' DAMAGES

Thomas seeks damages in the following amounts:

(a) present and future loss of
    earnings: .................. $230,000.00
(b) past and future pain and
    suffering: .................. $250,000.00
(c) past and future medical
    expenses: .................. $ 25,000.00

The Court separately considers each component of the requested damages.

### I. PRESENT AND FUTURE LOSS OF EARNINGS

At trial, Thomas offered the testimony of Dr. Peter Danner, a Professor of Economics at Marquette University, as to the loss of present and future earnings suffered by Thomas because of the July 1, 1980 acci-

dent. Using October 31, 1985 as the cutoff date for determining present and future earnings, Dr. Danner determined that Thomas suffered a present loss of earnings equal to $102,220.00 and a loss of future earnings equal to a present cash value of $128,543.00. Dr. Danner based the loss of future earnings on a worklife expectancy of 6.3 years as determined from the worklife expectancy standards published by the Bureau of Labor Statistics and a projected wage increase from year to year of 1.2% in real terms.

In addition to the above assumptions, Dr. Danner based his calculations on the assumption that Thomas would remain unemployed for the duration of his worklife expectancy. Dr. Danner based this assumption on the report of Timothy Riley, a Vocation Rehabilitation Specialist. After examining Thomas' situation and Thomas' employment capacity, Riley concluded that Thomas was completely disabled from a vocational standpoint. Riley concluded that Thomas' age, physical condition and general lack of cross-applicable skills rendered him suitable for work only in sedentary jobs.

In response, defendant asserts that Thomas failed to mitigate his damages by not diligently and seriously seeking other employment. Further, defendant challenges the conclusions reached by Riley and Dr. Danner.

#### A. Present Loss of Earnings

As stated above, Dr. Danner calculated Thomas' present loss of earning to be $102,220. Defendant challenges this figure in two respects. First, defendant contends that Dr. Danner, in calculating the number of hours that Thomas would have worked but for the accident, erroneously failed to account for cash payments paid in addition to Thomas' hourly wage. At trial, Dr. Danner testified that he calculated Thomas' total number of hours worked over the thirteen years prior to the accident. In calculating these total hours worked, Dr. Danner divided Thomas' gross wages by his wage rate. However, Thomas' gross

wages used in these calculations would have contained both his hourly wages plus any cash payments reflecting off-season benefits, year-end bonuses or container royalties. Dr. Danner did not determine whether in each of the thirteen years preceding the accident Thomas received cash payments over and above his hourly wages. However, it was established that Thomas received such payments in each of the years 1980 through 1983 (Trial Testimony of Dr. Danner at 34). With no proof to the contrary appearing in the record, the Court accepts defendant's position that Dr. Danner's calculations should reflect that Thomas' gross wages for the thirteen years preceding the accident consisted 90% of hourly wages and 10% of other cash payments. (*See* Trial Testimony of Dr. Danner at 34–36). Accordingly, the Court reduces Dr. Danner's present loss of earnings calculations by $10,220.

■ Defendant also challenges Dr. Danner's failure to reduce Thomas' lost earnings because Thomas suffered a broken ankle in 1982. The Court finds that Dr. Danner's failure to reduce his calculations of lost earnings because of Thomas' 1982 injury does not render his calculations inaccurate. Thomas testified at trial that he broke his ankle in 1982 when he fell while descending a stairs. He further testified that he could not recall whether he fell because he slipped or whether his leg gave out. Further, there exists no evidence in the record, from any source, probative of whether or not Thomas' fall in 1982 can be blamed on the July 1, 1980 accident which weakened his right knee. Only through sheer speculation could the Court conclude that unyielding Providence had destined Thomas to slip on the stairs in 1982 resulting in the broken ankle and that this event was not influenced by Thomas' injuries incurred on July 1, 1980. Accordingly, the Court finds that Thomas can recover lost earnings for 1982.

**B. Future Loss of Earnings**

■ Dr. Danner determined Thomas' future loss of earnings to be $128,543.00.

Defendant challenges this figure in several respects. Defendant contends that Dr. Danner improperly used October 31, 1985 as the pertinent date for determining present and future loss of earnings. The Court agrees with defendant that the pertinent date for Dr. Danner's calculations should have been the date of the accident—July 1, 1980. The premise for determining Thomas' lost earnings is how much Thomas would have earned had the accident of July 1, 1980 not occurred. As such, the pertinent date from which loss of future earnings should be determined is July 1, 1980. Accordingly, the Court will subtract $22,646.00 from Thomas' calculated lost earnings, the amount that Thomas' lost earnings would be reduced if the July 1, 1980 date was the date from which Thomas' worklife expectancy was measured, as calculated by Dr. Danner. (*See* Trial Transcript of Danner's Testimony at 64–65).

■ Defendant further contends that Dr. Danner overestimated by 15% Thomas' future hours that he would have worked but for the accident. In determining Thomas future loss of earnings, Dr. Danner used his previously calculated annual hours that Thomas would have worked but for the accident. Defendant maintains that Dr. Danner should have averaged the number of hours worked in 1985 by the longshoremen just above and just below Thomas in seniority and used this average as the amount that Thomas would have worked annually in the future. If Dr. Danner had used such an average in his calculations, his calculated future loss of earnings would be reduced by 15%. (*See* Trial Testimony of Dr. Danner at 72).

The Court accepts defendant's argument and finds that Dr. Danner's calculated future loss of earnings should be reduced by 15%. The declining nature of the Great Lakes shipping industry, *see generally City of Milwaukee, Wis. v. Block*, 634 F.Supp. 760 (E.D.Wis.1986), renders it more appropriate to calculate Thomas' future hours worked annually by considering the annual hours worked most recently by his longshoremen colleagues most similar to

him in terms of seniority. Accordingly, Dr. Danner's calculated future loss of earnings will be reduced by 15%.

Finally, defendant contends that Thomas' future loss of earnings should be reduced because of his failure to mitigate damages. In *Hanna v. American Motors Corp.*, 724 F.2d 1300 (7th Cir.1984), the Seventh Circuit set forth the general rule regarding mitigation of damages:

> Under the general rule of damages, where one is injured or damaged by the wrongful act of another, he is bound to exercise reasonable care and diligence in mitigating the resulting damage [citations omitted].

724 F.2d at 1306.

The Court finds that the evidence at trial established that Thomas has a 115 full-scale I.Q. with good communication, math, spelling and reading skills but that he is uninterested in returning to school and has been unwilling to accept employment which would not provide him with a wage equal to that of a longshoreman. The record also establishes that Thomas is capable of working at sedentary employment. Finally, the reports from the placement services display Thomas' aversion to obtaining new work. These reports show that Thomas has failed to keep a number of job interview opportunities presented to him and Thomas has appeared at some interviews in a T-shirt, hat, old blue jeans, and with body odor complained of by the job interviewer.

The Court finds that Thomas is capable of performing sedentary work and that his failure to diligently seek such employment necessitates a finding that Thomas has failed to make reasonable efforts to mitigate his damages. As such, the Court is in agreement with the district court for the Eastern District of Louisiana:

> According to his (the plaintiff's treating physician) testimony, [plaintiff] should not return to longshoreman work. But this does not mean that [plaintiff] is unemployable for all purposes. Consequently, though the fact that he cannot return to his occupation must be con-

sidered in determining damages, nevertheless, it must also be borne in mind that [plaintiff] is required under the law to minimize his damages by earning what he can.

*Alexander v. Meiji Kaiun KK*, 195 F.Supp. 831, 834 (E.D.La.1961). Accordingly, the Court will reduce Thomas' present and future loss of earnings by twenty percent (20%), the figure estimated by Dr. Danner to best approximate the amount that Thomas could have earned at a sedentary job paying minimum wage.

In sum, the Court determines Thomas' lost earnings as follows:

| | |
|---|---:|
| Present Loss of Earnings—(as determined by Dr. Danner) | $102,220 |
| Less: (adjustment for Dr. Danner's failure to account for cash payments received by plaintiff in addition to hourly wage in calculating plaintiff's hours worked) | ($ 10,220) |
| Adjusted Present Loss of Earnings Prior to Reduction for Failure to Mitigate | $ 92,000 |
| Less: Reduction for Failure to Mitigate (20% × $92,000) | ($ 18,400) |
| Court Adjusted Present Loss of Earnings | $ 73,600 |
| Future Loss of Earnings—(as determined by Dr. Danner) | $128,543 |
| Less: (adjustment for Dr. Danner's failure to use 7/1/80 as pertinent date) | ($ 22,646) |
| Less 15% of $128,543: (adjustment for Dr. Danner's over-estimation of plaintiff's future hours) | ($ 19,281) |
| Add: (15% of $22,646) | $ 3,396 |
| Adjusted Future Loss of Earnings Prior to Reduction For Failure to Mitigate | $ 90,012 |
| Less: Reduction For Failure to Mitigate (20% × $75,251) | ($ 15,050) |
| Court Adjusted Loss of Future Earnings | $ 74,962 |
| Before Tax Loss of Earnings | $148,562 |
| Less: Reduction For Taxes (12% of $133,851) | ($ 16,062) |
| **NET LOSS OF PRESENT AND FUTURE EARNINGS** | **$132,500** |

## II. PAST AND FUTURE PAIN AND SUFFERING

The Court has previously detailed the events of July 1, 1980, and the medical treatment administered to Thomas and his resulting recuperation. Further, the Court recognizes that prior to the accident of July

1, 1980, Thomas had experienced an injury to his right knee for which he was treated by an orthopedic surgeon in 1975, and that he complained of pain in his right knee again in 1978 to a different treating physician. Based on the evidence received at trial, the Court determines that Thomas is entitled to an award of $80,000.00 as compensation for past and future pain and suffering.

### III. PAST AND FUTURE MEDICAL EXPENSES

The parties have stipulated that Thomas has incurred past medical and rehabilitation expenses in the amount of $11,379.29. The trial testimony of Doctors Rath and Hirschtick establish that Thomas will incur medical expenses relating to future treatment of the arthritic condition which has developed as a result of his knee injury. The Court accepts Thomas' estimates of these future expenses and, accordingly, awards $25,000.00 as compensation for both past and future medical expenses.

### SUMMARY

The Court finds defendant negligent in providing Meehan with a crane in an unreasonable working condition, specifically one possessing a defective braking mechanism. The Court further finds that this negligence proximately caused plaintiff John Thomas' injuries and the damages to Meehan's forklifts pursuant to the accident of July 1, 1980, on the BIOKOVO. Pursuant to this finding of negligence, the Court awards John Thomas as damages the sum of **$237,500.00** ($132,500.00 + $80,000.00 + $25,000.00). Further, the Court awards plaintiff Commercial Union **$10,338.80** as damages and plaintiff Meehan **$800.00** as damages.